**O'SHANTER RESOURCES, INC., Plaintiff,**

v.

**NIAGARA MOHAWK POWER CORPORATION, Defendant.**

No. 94–CV–348S.

United States District Court, W.D. New York.

Feb. 27, 1996.

commenced this action against defendant on May 9, 1994, seeking damages for an alleged breach of contract and breach of the duty of good faith and fair dealing. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $50,000 exclusive of interest and costs, and plaintiff and defendant are citizens of different states. Defendant filed a motion for summary judgment dismissing the complaint on April 3, 1995, and plaintiff filed a cross-motion for summary judgment on May 3, 1995. On May 31, 1995, this Court granted plaintiff's motion, filed with consent of defendant, that the summary judgment motions be resolved on submission without oral argument.[1]

For the reasons set forth below, this Court will deny both parties' motions for summary judgment.

## FACTS

In 1978, Congress enacted the Public Utility Regulatory Policies Act ("PURPA") to encourage cogeneration and small power production by requiring electric utilities to purchase electric energy from qualifying cogeneration facilities and qualifying small power production facilities. 16 U.S.C. §§ 796, 824a–3. Under PURPA, states must implement rules regulating the purchase by utilities of power from such facilities. *Id.* § 824a–3. The New York Public Service Law accordingly provides that the New York Public Service Commission ("PSC") shall require electric utilities to enter into long-term contracts for the purchase of electricity from alternative energy sources. N.Y. Public Service Law § 66–c (McKinney 1989 & Supp. 1996). The Public Service Law further authorizes the PSC to supervise the contract

Herman P. Loonsk, Steven J. Weiss, Saperston & Day, Buffalo, NY, Natalie F.P. Gilfoyle, Roger D. Stark, Jana Baldwin, McDermott, Will & Emery, Washington, DC, for plaintiff.

Robert A. Barr, Hiscock & Barclay, Syracuse, NY, for defendant.

### DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Before this Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff

---

1. In support of its motion for summary judgment and in opposition to plaintiff's motion, defendant has submitted a memorandum of law ("D.Memo"); a reply memorandum of law ("D.R.Memo"); a statement of facts pursuant to Rule 56 of the Local Rules of Civil Procedure for the Western District of New York ("D.Facts"); a response to plaintiff's statement of facts ("D.R.Facts"); an affidavit of Herbert Schrayshuen ("Schrayshuen Aff."); an affidavit of Robert Barrer ("Barrer Aff."); a reply affidavit of Herbert Schrayshuen ("Schrayshuen R.Aff."); a reply affidavit of Robert Barrer ("Barrer R.Aff."); and a set of referenced exhibits ("D.Exh.").

Plaintiff, in support of its motion for summary judgment and in opposition to defendant's motion, has submitted a memorandum of law ("P.Memo"); a reply memorandum of law ("P.R.Memo"); a counterstatement and statement of facts pursuant to Local Rule 56 ("P.Facts"); an affidavit of Adam Krehm ("Krehm Aff."); an affidavit of Eugene Preston ("Preston Aff."), with an exhibit; an affidavit of Jana Baldwin ("Baldwin Aff."); and a set of referenced exhibits ("P.Exh.").

formation process between electric utilities and qualifying facilities. *Id.*

Plaintiff O'Shanter Resources, Inc. ("O'Shanter") and defendant Niagara Mohawk Power Corporation ("Niagara Mohawk" or "Niagara") entered into a "Power Purchase Agreement" ("the Agreement") in October 1988 pursuant to PURPA and § 66–c of the New York State Public Service Law. Under the Agreement O'Shanter would build and operate a cogeneration facility from which Niagara Mohawk would purchase the electricity generated. (D.Exh. 2.) Niagara Mohawk is an electric and gas utility with its office and principal place of business in Syracuse, New York. O'Shanter is a corporation incorporated under the laws of the State of Texas, having its principal place of business in Toronto, Ontario, Canada. (D.Exh. 2.)

The Agreement provides that O'Shanter would own and operate its electric generating plant in Chautauqua County, New York, without specifying any more precise location. (D.Exh. 2; P.Exh. F, p. 2; P.Exh. K, p. 135.) The parties agreed in the twentieth paragraph of the Agreement that Niagara Mohawk would submit the Agreement to the PSC for its review and possible modification or abrogation as required under the New York Public Service Law. (D.Exh. 2; P.Exh. K, p. 63.) In addition to submission of the Agreement to the PSC, O'Shanter submitted an Environmental Information Requirements Form ("EIRF") to the PSC on July 31, 1989. The EIRF identified the location of the proposed site as Honeyset Road southwest of Plank Road in the Town of Chautauqua ("Honeyset/Plank Road site") and provided various environmental impacts of that proposed location. (D.Exh. 7.)

The PSC notified Niagara Mohawk in a letter dated September 27, 1989, "that the Commission [PSC] has accepted O'Shanter's environmental filing and has approved the contract...." The letter explained, however, that "contract approval is contingent on O'Shanter's obtaining all environmental permits required by the NYS–DEC [New York State Department of Environmental Conservation ("DEC")] and filing them with the Commission, along with a description of all final environmental impacts ... and a de-

scription of the environmental control measures finally utilized." The letter also required O'Shanter to comply with a maximum sound level of 40 dbA at any existing residence. (D.Exh. 3.)

After the PSC approved the contract, O'Shanter considered locating the project at sites other than the Honeyset/Plank Road site for a variety of reasons. (D.Exh. 4, pp. 100–23; Krehm Aff. ¶ 10.) O'Shanter ultimately decided to construct the facility adjacent to the Lakeview Shock and ASATC Correctional Facilities in the Town of Portland in Chautauqua County ("Lakeview site"). (Krehm Aff. ¶ 10; Schrayshuen Aff. ¶ 21.) According to O'Shanter, the Lakeview site was preferable to the Honeyset/Plank Road site because, among other reasons, the sound level at the Lakeview site would not impact the surrounding area. (Krehm Aff. ¶ 10; D.Exh. 5, p. 19.)

By letter dated June 24, 1992, O'Shanter's President, Adam Krehm, notified Niagara Mohawk that "[t]he project is to be located at the Lakeview Shock Incarceration Facility, Brocton, New York." (P.Exh. N.) Niagara Mohawk Senior Analyst William Stier responded on behalf of Niagara Mohawk on July 13, 1992, noting that "[t]he September 27, 1989 New York State Public Service Commission correspondence approving your contract references acceptance of O'Shanter's environmental filing." Stier asked Krehm to "advise if your change in site location affects your filing and your time table for amending same, if required." (D.Exh. 25.) Eugene Preston, President of Amergy Corporation, O'Shanter's consulting engineer, advised Stier in a letter dated September 14, 1992, that "[t]he current site location has been transmitted to the NYS DEC. Permitting was begun for this site in July 1992 and will be completed after startup, in accordance with standard DEC procedure." (P.Exh. O.)

On December 10, 1992, O'Shanter provided the PSC with the environmental permits required by the DEC, and a description of final environmental impacts and final environmental control measures for the Lakeview site. O'Shanter also provided a pre-operation noise analysis. (P.Exh. P.) Dan Driscoll from PSC discussed the noise analysis with

Adam Krehm on December 17, 1992, and with Eugene Preston on December 18, 1992.

Niagara Mohawk in the meantime monitored and reviewed the progress of O'Shanter's construction at the Lakeview site. Representatives of Niagara Mohawk visited the site on September 29, 1992, for a start of construction meeting, at which time the initial stages of construction were underway. (Krehm Aff. ¶ 16; P.Exh. L, pp. 70–76.) On January 18, 1993, Niagara Mohawk provided O'Shanter with an approved interconnection report that Niagara Mohawk had prepared for the Lakeview site. (P.Exh. Q.) As construction continued, Niagara Mohawk made further visits to the Lakeview site, including visits on August 12, September 2, and October 6, 1993, to inspect the progress of construction. (Krehm Aff. ¶ 16; P.Exh. R.)

On September 20, 1993, William Stier informed Adam Krehm that Niagara Mohawk was "seriously interested" in pursuing either a buy-out or a several year postponement of the Agreement. (D.Exh. 12.) In 1992 and 1993, Niagara Mohawk had contacted various other developers about the possibility of either delaying the start of construction or cancelling projects. (P.Exh. L, p. 99; D.R.Facts, p. 8.) Niagara Mohawk makes no secret of the fact that it considers the above-market price terms the PSC imposes on contracts like the Agreement with O'Shanter to be economically unreasonable. (D.R.Facts, p. 8; P.Exhs. H–J.) As explained in the September 20, 1993 letter to O'Shanter, Niagara Mohawk's buy-out policy was "to pay up to one and one half (1.5) times of actual project expenditures." (D.Exh. 12.)

Krehm responded on September 27, 1993. He explained that O'Shanter had made significant progress in construction and intended to complete the project and deliver electricity under the terms of the Agreement. O'Shanter was "nonetheless ... willing to discuss ... the proposals of buyout or postponement" though it considered Niagara Mohawk's buyout policy "not sufficient in light of the advanced state of development and construction of the project." (D.Exh. 13.) Krehm further requested in a letter dated November 16, 1993, that Niagara Mohawk "issue a letter confirming that it shall not

terminate this contract pursuant to this paragraph twentieth." (P.Exh. S.) The Agreement's twentieth paragraph provides that "NIAGARA agrees to issue a letter to SELLER, after COMMISSION review and action satisfactory to NIAGARA, stating that NIAGARA shall not terminate this AGREEMENT pursuant to Paragraph TWENTIETH." (D.Exh. 2.)

Niagara Mohawk did not issue such a letter but did meet with O'Shanter on January 6, 1994 to discuss its buyout and postponement proposals. (D.Exh. 4, pp. 159–60.) O'Shanter claims that by this time it had spent approximately $2 million on the project. (D.Exh. 4, p. 161.) According to Krehm, Niagara Mohawk's implicit refusal to honor paragraph 20, coupled with it policy of trying to stop these projects, had cast a cloud over the deal. (D.Exh. 4, p. 166.) The parties executed a confidentiality agreement with the intent to further pursue the buyout and postponement matters discussed at the January 6, 1994 meeting. (D.Exh. 20; P.Exh. J.) On February 14, 1994, Krehm sent buyout and postponement proposals on behalf of O'Shanter to Niagara Mohawk for its consideration. (D.Exh. 20.)

In the meantime, on December 28, 1993, the PSC issued an order in a proceeding entitled *Consolidated Edison Company of New York, Inc. and Indeck Energy Services of Yonkers, Inc.*, Case No. 89–E–1158 ("*Indeck Yonkers* order"). (D.Exh. 22.) Herbert Schrayshuen, Niagara Mohawk's Director of Unregulated Generation, described the *Indeck Yonkers* order as follows:

In its Order, the PSC granted the request of the utility (Consolidated Edison) for clarification of the PSC's original approval of a similar Power Purchase Agreement by holding that approval is "site specific." Thus, where the Power Purchase Agreement in *Indeck Yonkers* references the "City of Yonkers," the developer's decision to move the site less than one mile away within the same city was held to violate the site certainty policy. The consequences of such a violation would be that the developer must negotiate a new Power Purchase

Agreement at rates then in effect under PSC policy.

(Schrayshuen Aff. ¶ 15.)

On February 23, 1994, Schrayshuen discussed the *Indeck Yonkers* order with Krehm on the telephone and informed Krehm that Niagara Mohawk might apply to the PSC for clarification of the site specific policy as it applied to the Agreement. Since O'Shanter had moved the project from the Honeyset/Plank Road site to the Lakeview site after the PSC had rendered its approval, there was now an issue, according to Schrayshuen, as to the validity of the entire Agreement. Schrayshuen advised Krehm to seek counsel in this regard. (D.Exh. 4, p. 170; Schrayshuen Aff. ¶ 16; P.Exh. K, p. 107.) At no prior time had Niagara Mohawk informed O'Shanter that it had any objection to O'Shanter's construction and operation of the project at the Lakeview site. (P.Exh. F, p. 6.)

Krehm followed up the February 23, 1994 telephone conversation with a letter to Schrayshuen dated March 1, 1994. Krehm expressed O'Shanter's strong disagreement "with any notion that Niagara has a right to request PSC intervention for the purpose of 'clarifying' an unambiguous contract which both [ ] organizations have been implementing for several years." He further explained that Niagara Mohawk's "stated intention to request a PSC 'clarification' raises serious questions about Niagara's intention to comply with its contractual obligations. Accordingly, we request written confirmation that Niagara remains committed to honouring its obligations under our contract and that Niagara will exert its best good faith efforts to implement it." (D.Exh. 24.)

Niagara Mohawk never provided O'Shanter with any such written confirmation. (P.Exh. K, p. 119.) Rather, in a letter dated March 22, 1994, Schrayshuen explained how Niagara Mohawk had reviewed the status of the Agreement in light of the *Indeck Yonkers* order:

> Given the similarity of circumstances of O'Shanter's situation with the Indeck–Yonker's case, and the clear message from the case, which imposes the obligation on O'Shanter to request a new contract when

the project location is moved, Niagara Mohawk can only make a nominal offer to buy out the PPA [Power Purchase Agreement].

> Niagara Mohawk is prepared to offer O'Shanter $50,000 to resolve this matter.

> If you accept this offer, kindly sign both copies of the enclosed cancellation agreement, after which we will remit the buyout payment.

> If you cannot accept this buy-out offer, please contact me to initiate discussions regarding the implementation of a new contract.

(D.Exh. 26.)

Krehm responded by letter dated April 14, 1994, that "we understand from your letter that Niagara Mohawk does not intend to go forward with its Power Purchase Agreement with O'Shanter...." While O'Shanter "strongly disagreed" with Niagara Mohawk's position, it was "interested in resolving this matter." Krehm asked that Niagara Mohawk provide an outline of the terms of the "new" contract referenced in the March 22, 1994 letter by April 21, 1994. (D.Exh. 27.)

After receiving no response from Niagara Mohawk to the April 14, 1994 letter (Krehm Aff. ¶ 34), O'Shanter filed the instant action on May 9, 1994. Schrayshuen had sent Krehm a letter dated May 3, 1994, which Krehm claims he received after the complaint was filed. (Krehm Aff. ¶ 34.) The letter stated that a new contract would be based on current PSC policies (D.Exh. 28), which means Niagara Mohawk would pay O'Shanter significantly lower rates under the new contract, (D.Exh. 28). O'Shanter stopped all work on the project "around this time." (D.Exh. 4, p. 182.)

Upon consultation with its own counsel and PSC counsel, Niagara Mohawk never sought a PSC clarification based on the *Indeck Yonkers* order. (D.R.Facts, p. 11.)

## DISCUSSION

O'Shanter alleges two causes of action against Niagara Mohawk in its complaint: (1) breach of contract and (2) breach of the duty of good faith and fair dealing. The breach of contract cause of action alleges that Niagara

Mohawk breached the Agreement by manifesting an intention not to perform its material obligations to take and pay for electric energy and capacity in accordance with the Agreement. Niagara Mohawk disputes that it has done any such thing. The second cause of action alleges that Niagara Mohawk breached its duty to deal fairly and in good faith with O'Shanter by repudiating its contractual obligations after extracting payments from O'Shanter under the Agreement for four years. Niagara Mohawk responds, as it also does to the breach of contract charge, that it never formally nor informally repudiated any obligations under the Agreement. Each party submits it is entitled to summary judgment based on the evidence of record.

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* at 248, 106 S.Ct. at 2510.

Under Rule 56, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1223 (2d Cir.1994). A party moving for summary judgment can meet its burden either by producing evidence showing the absence of a genuine issue of material fact or by pointing out to the court that there is an absence of evidence supporting one or more essential elements of the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Rule 56 further provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The function of the court is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. A summary judgment motion will not be defeated, however, merely on the basis of a "metaphysical doubt" about the facts, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), "or on the basis of conjecture or surmise," *Bryant,* 923 F.2d at 982. The nonmoving party must come forward with significant probative evidence in support of its complaint. *See Capital Imaging v. Mohawk Valley Medical Associates,* 996 F.2d 537, 542 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

Where both sides have moved for summary judgment, each motion must be decided on its own merits and all reasonable inferences drawn against the party whose motion is under consideration. *Schwabenbauer v. Board of Education of Olean,* 667 F.2d 305, 314 (2d Cir.1981). Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials," *id.* at 541, and "to isolate and dispose

of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553.

## B. *Breach of Contract*

O'Shanter alleges that Niagara Mohawk breached the Agreement under the doctrine of anticipatory repudiation. It contends, first, that Niagara Mohawk communicated a positive and unequivocal repudiation of the Agreement and, second, that Niagara Mohawk refused to provide adequate assurances of performance under § 251 of the Restatement (Second) of Contracts.

■ Plaintiff's second claim, that of refusal to provide adequate assurances, will be addressed first. Restatement § 251 was designed to

provide a remedy for one party's reasonable fears that the other party to a contract will not perform. In certain circumstances the section allows one party to demand assurances of performance from the other and if the other fails to provide adequate assurances, to treat that failure as a repudiation of the contract.

James J. White, *Eight Cases and Section 251,* 67 Cornell L.Rev. 841 (1982).[2] While O'Shanter provides a well-argued analysis of adequate assurances under § 251, "[t]he Restatement ... is not the substantive law of New York and creates no rights not already incorporated by New York statutory and common law." *Encogen Four Partners v. Niagara Mohawk Power Corporation,* 914 F.Supp. 57, 62 (S.D.N.Y.1996).

■ Under New York common law, which both parties agree applies to this dispute, no right to demand or duty to provide adequate assurances exists. New York courts "have strictly adhered" to the rule "at common law [that] no such duty to provide adequate assurances existed." *Id.* at 61 (quoting *Sche-*

*nectady Steel Co., Inc. v. Bruno Trimpoli General Construction Co., Inc.,* 43 A.D.2d 234, 236, 350 N.Y.S.2d 920, 922 (3d Dep't), *aff'd,* 34 N.Y.2d 939, 316 N.E.2d 875, 359 N.Y.S.2d 560 (1974); *Elliott Associates, L.P. v. Bio–Response, Inc.,* Civ.A. No. 10624, 1989 WL 55070, *3, 1989 Del.Ch. LEXIS 63, *7–9 (May 23, 1989) (in case where New York law applied, "plaintiffs cite no New York case law adopting the Restatement [§ 251] position"), *aff'd,* 1989 WL 72028, *1, 1989 Del.Ch. LEXIS 73, *2–3 (June 21, 1989) ("[C]oncept of an anticipatory breach caused by failure to provide adequate assurance of performance ... was not recognized at common law.... Plaintiffs ... have not cited any New York decisions where either [U.C.C.] § 2–609 or Restatement (Second) § 251 ( ) was applied in a non-sale of goods situation."); John D. Calamari & Joseph M. Perillo, The Law of Contracts § 12–2, at 518 (3d ed. 1987) ("U.C.C. § 2–609 introduced into the law the notion that where a party to a contract is guilty of serious prospective inability or unwillingness to perform, the other may make a demand for 'adequate assurances·of due performance.' There was no such common law procedure.")); *but cf. Marvel Entertainment Group v. ARP Films, Inc.,* 684 F.Supp. 818, 820 (S.D.N.Y.1988) (discussing but not applying the principles of Restatement § 251).

■ Although no right to demand or duty to provide assurances exists under New York law, the failure to provide assurances after a demand can be presented to the jury as evidence of an anticipatory repudiation. *Mollohan v. Black Rock Contracting, Inc.,* 160 W.Va. 446, 451 n. 1, 235 S.E.2d 813, 816 n. 1 (1977) ("We are not prepared to adopt the concept [of adequate assurances in Restatement § 251] in our general contract law except to the extent that a demand for assurances and failure to give them may be evidence of repudiation to present to a jury with other evidence to prove absolute, unequivocal

**2.** Section 251, a direct descendant of § 609 of the Uniform Commercial Code, provides:

(1) Where reasonable grounds arise to believe that the obligor will commit a breach by nonperformance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurances of due performance and may, if reasonable, suspend any performance for which

he has not already received the agreed exchange until he receives such assurance.

(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Restatement (Second) of Contracts § 251 (1979).

and positive repudiation and anticipatory breach.").

■ That brings us to O'Shanter's primary basis for its claim of anticipatory breach—that Niagara Mohawk communicated a positive and unequivocal repudiation of the Agreement irrespective of its claimed right to demand assurances. An anticipatory repudiation occurs when a party disclaims the duty to perform under the contract prior to the time designated for its performance and before it has received all the consideration due. *Wester v. Casein Co. of America,* 206 N.Y. 506, 513–14, 100 N.E. 488, 490 (1912). Such repudiation entitles the nonrepudiating party to rescind the contract and claim damages for total breach. *Id.; Long Island Rail Road Co. v. Northville Industries Corp.,* 41 N.Y.2d 455, 463, 362 N.E.2d 558, 563, 393 N.Y.S.2d 925, 930 (1977) (citations omitted). "To constitute an anticipatory repudiation there must be a clear manifestation of intent communicated in advance of the time for performance that when the time for performance arrives the required performance will not be rendered." *Record Club of America v. United Artists Records,* 643 F.Supp. 925, 936 (S.D.N.Y.1986) (quoting Ronald A. Anderson, Uniform Commercial Code § 2–610:11, at 230 (3d ed. 1983)) (other citation omitted).

In other words, anticipatory repudiation occurs when "there is an 'overt communication of intention' not to perform." *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 150, 379 N.E.2d 1166, 1168, 408 N.Y.S.2d 36, 38 (1978). For these principles to operate, "the expression of intention not to perform must be positive and unequivocal." *Record Club of America,* 643 F.Supp. at 936 (citing *Tenavision,* 45 N.Y.2d at 150, 408 N.Y.S.2d 36, 379 N.E.2d 1166); *see also* 4 Arthur L. Corbin, Contracts § 973 (1951) ("definite and unequivocal"); 11 Samuel Williston, Contracts § 1322 (3d ed. 1968) ("positive and unconditional").

O'Shanter alleges that Niagara Mohawk communicated a positive and unequivocal repudiation of the agreement by (1) not responding to O'Shanter's written requests for written confirmation that Niagara Mohawk would perform its obligations, most notably the request in Krehm's March 1, 1994 letter, and (2) directing O'Shanter to contact Niagara Mohawk to initiate discussions regarding a new contract if O'Shanter rejected Niagara Mohawk's $50,000 offer to resolve the matter. According to O'Shanter, "the plain words of Niagara's March 22, 1994 letter, standing alone, are an unequivocal repudiation on their face." (P.Memo, p. 22.)

Niagara Mohawk strongly disputes this characterization of the facts. The March 22, 1994 letter, it contends, was sent in the context of ongoing settlement discussions and did not implicitly or explicitly state that Niagara Mohawk would not perform its share of the agreement. (D.R.Memo, p. 3.) Niagara Mohawk maintains that it still stands ready, willing, and able to perform its material obligations under the agreement despite what it characterizes as its own "hard bargaining."

Both parties argue by analogy to the decision in *Record Club of America.* In that case, the district court held that "[the defendant's] statements that it would cease servicing [the plaintiff] unless [the plaintiff] entered into a new agreement containing terms substantially more favorable to [the defendant] was a[n anticipatory] repudiation." 643 F.Supp. at 936. In the instant case, however, Niagara Mohawk never expressly stated that it would not perform its obligations under the agreement. Whether the implication that Niagara Mohawk would not perform unless O'Shanter entered a new agreement was positive and unequivocal is another issue. As one commentator has explained, "[w]hether a particular event or communication amounts to repudiation is often seen as a question of fact, and the cases and analyses provide limited guidance." Arthur Rosett, *Partial, Qualified, and Equivocal Repudiation of Contract,* 81 Colum.L.Rev. 93, 103 (1981).

On the one hand, Niagara Mohawk's March 22, 1994 letter could be read as an unequivocal repudiation in the context in which it was sent. Rather than respond to O'Shanter's requests for assurances that Niagara Mohawk intended to perform its contractual obligations, the letter stated that O'Shanter should contact Niagara Mohawk to

"initiate discussions regarding the implementation of a new contract." On the other hand, the March 22 letter did reference the parties' ongoing "buy-out discussions." According to Herbert Schrayshuen, Niagara Mohawk never intended to avoid its performance under the Agreement but did believe there was an issue as to the Agreement's validity. (Schrayshuen R.Aff. ¶ 15.) Schrayshuen's letter sought to push a new bargain but did not state that Niagara Mohawk would not honor the existing Agreement. (Schrayshuen R.Aff. ¶ 19.) Though Niagara Mohawk's subjective intent is by no means dispositive, there is no dispute that O'Shanter willingly participated in the ongoing buy-out discussions.

What further complicates this case is Niagara Mohawk's belief that the *Indeck Yonkers* order affected the parties' existing contractual obligations though Niagara Mohawk never applied for a PSC clarification. "When a party seeks to modify a continuing agreement, he must take great care to avoid the implication that unless the contract is modified as requested, such party will not perform at all." *Rosett,* 91 Colum.L.Rev. at 106. Courts and commentators have noted that "an expression of doubt as to whether the ability to perform in accordance with the contract will exist when the time comes, is not a repudiation." *Elliott Associates,* 1989 WL 55070, at *3, 1989 Del.Ch. LEXIS 63, at *4 (citing 4 Arthur L. Corbin, Contracts § 974 (1951)).

▮ In other words, a demand for more than the contract calls for is not in itself a repudiation. Only when it amounts to a clear and unequivocal statement of intention not to perform except on conditions that go beyond the contract is it a repudiation. Given the ongoing buyout discussions that occurred simultaneous with the parties' continuing performance, reasonable minds could differ as to the import of the evidence. Drawing all reasonable inferences in Niagara Mohawk's favor, Niagara Mohawk expressed only some doubt as to whether it had to perform if O'Shanter did not negotiate a new contract. Drawing all reasonable inferences in O'Shanter's favor, Niagara Mohawk's March 22 letter, considered with its failure to provide requested assurances, was a clear and unequivocal repudiation.

▮ With a genuine issue as to the material fact of whether Niagara Mohawk clearly and unequivocally expressed an intention not to perform, this Court will deny the parties' cross-motions for summary judgment on O'Shanter's first cause of action for breach of contract by anticipatory repudiation.

## C. *Breach of the Duty of Good Faith and Fair Dealing*

O'Shanter's second cause of action alleges that Niagara Mohawk negotiated in bad faith and thereby breached its duty of good faith and fair dealing.

▮ Every contract contains an implied covenant of good faith and fair dealing. *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917); *see also Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 363 N.E.2d 573, 394 N.Y.S.2d 867 (1977); *Van Valkenburgh, Nooger & Neville v. Hayden Publishing Co.,* 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Mutual Life Insurance Co. v. Tailored Woman,* 309 N.Y. 248, 128 N.E.2d 401 (1953). In other words, "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933) (citations omitted). In the instant case, Niagara Mohawk's "good faith must be subjected to particular scrutiny because [its] obligation to enter into the contract[ ] was not voluntarily assumed but imposed by law." *Philadelphia Corp. v. Niagara Mohawk Power Corp.,* 207 A.D.2d 176, 177, 621 N.Y.S.2d 237, 239 (3d Dep't 1995).

O'Shanter argues that Niagara Mohawk breached its implied promise of good faith and fair dealing when it "contrived the 'site-certainty' issue to intimidate O'Shanter into a fire-sale buy-out." (P.R.Memo, p. 7.) O'Shanter points out that Niagara Mohawk

(1) refused to provide a letter confirming that it would not terminate the Agreement; (2) refused to provide written (or verbal) confirmation that it was not repudiating the Agreement; and (3) advised O'Shanter verbally and in writing that it intended to seek a review by the PSC of the validity of the Agreement.

(P.Memo, p. 31.) Niagara Mohawk believes that its efforts to negotiate a new contract based on the *Indeck Yonkers* order were all in good faith.

 The only issue to be resolved now, of course, is whether there is a genuine issue in this regard, specifically as to whether Niagara Mohawk did anything that had the effect of destroying or injuring O'Shanter's right to receive the fruits of the parties' Agreement. That depends on whether Niagara Mohawk acted honestly and reasonably with respect to its contractual obligations. The fact that Niagara Mohawk never sought a PSC clarification cuts both ways. It could evidence, as O'Shanter argues, an intimidation tactic to force a new agreement. On the other hand, a reasonable juror could also find based on the evidence of record that Niagara Mohawk reasonably raised the site-certainty issue in the context of ongoing buy-out discussions with full intent to fulfill the original agreement if negotiations ultimately failed.

Since a genuine issue exists in this regard, summary judgment is not appropriate, and the parties' cross-motions will be denied as to the second cause of action.

### CONCLUSION

For the reasons set forth above, drawing all reasonable inferences against each party in considering their respective motions, this Court will deny the parties' cross-motions for summary judgment.

### ORDER

IT HEREBY IS ORDERED, that defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is DENIED.

FURTHER, that plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is DENIED.

SO ORDERED.