**In re COIN PHONES, INC., Debtor.**

**Barbara BALABER–STRAUSS, Trustee of Coin Phones, Inc., Plaintiff,**

**v.**

**NEW YORK TELEPHONE and American Telephone & Telegraph Company, Defendants.**

**Bankruptcy No. 89 B 20451 (ASH).**
**Adv. No. 92–5334A.**

United States Bankruptcy Court,
S.D. New York,
White Plains Division.

July 26, 1996.

As Amended Oct. 10, 1996.

Kazlow & Kazlow by James M. Lemonedes, New York City, for Trustee.

Elizabeth A. Westcott, New York City, Davis Polk & Wardwell by Guy Miller Struve, New York City, for Defendant New York Telephone Co.

## AMENDED DECISION DETERMINING ADVERSARY PROCEEDING *

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Plaintiff Barbara Balaber–Strauss (the "Trustee") as Trustee of the debtor Coin Phones, Inc. ("CPI") commenced this adversary proceeding against defendants New York Telephone Company ("NYTel") and American Telephone & Telegraph Company ("AT & T") to recover damages for defendants' alleged wrongful conduct. The Trustee's claim against AT & T has been settled. Claims are asserted against NYTel based on negligent misrepresentation, tortious interference with economic opportunity and breach of the covenant of good faith and fair dealing.

CPI filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 21, 1989. On July 6, 1990 the case was converted to a case under Chapter 7. This adversary proceeding was commenced in October 1992. This Court has jurisdiction over the subject matter of this case under 28 U.S.C. §§ 1334(a) and 157(a). Venue is proper under 28 U.S.C. §§ 1391 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O). The case was tried to the Court without a jury during the course of six days in September 1995. Summations were presented in October and final post-trial briefs were filed in December 1995. The following constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, made applicable herein under Bankruptcy Rule 7052.

The task of finding the facts in this unusual case was complicated by inconsistencies and conflicts in the testimony of the witnesses, absence of certain witnesses who could have been expected to provide relevant testimony and lack of documents which one would have expected to exist. Moreover, there is an Alice-in-Wonderland aura surrounding the pivotal events in dispute. The findings below are necessarily informed by the Court's perceptions as to the reliability and credibility of the testimony and by inferences to be drawn from the oral and documentary evidence and, in some cases, lack of evidence.

### The Parties

CPI was a publicly-held corporation engaged in the pay telephone business. It installed and serviced customer-owned coin-operated telephones ("COCOTs") at approximately 1,650 locations in the New York metropolitan area between 1986 and 1989. NYTel was and is a state chartered and regulated monopoly providing local telephone service to commercial and private customers throughout the New York metropolitan area. Because of NYTel's monopoly position, COCOT vendors such as CPI were necessarily dependent on NYTel to provide local telephone service, interface with long distance carriers and screening and blocking

---

\* This decision reflects the "Amendment to Decision Dated July 26, 1996" dated October 10, 1996.

services to protect individual COCOT lines from long-distance access and fraud.

NYTel was itself engaged in the coin-operated telephone business in direct competition with CPI. Indeed, NYTel was the largest competitor in the business, owning and operating approximately 121,300 coin-operated telephones in the New York metropolitan area.

In addition to its roles as exclusive provider of local service and long-distance interface to independent COCOT vendors such as CPI, and the largest competitor of the independent COCOT vendors, NYTel acted as the billing and collection agent on behalf of AT & T under a billing and collections agreement between NYTel and AT & T. NYTel received compensation ("access fees") from AT & T based on the volume of calls connected to the AT & T network and billed to NYTel's customers. In accordance with the billing and collections agreement, NYTel would include in its monthly bill for each of CPI's COCOT lines charges for AT & T long-distance services. If CPI disputed all or any of the AT & T charges reflected on the NYTel statements, NYTel was required to notify AT & T of the dispute. If AT & T maintained that the charges were valid, and CPI persisted in disputing the charges, NYTel was required to "recourse" the disputed charges to AT & T for such further collection action as AT & T deemed appropriate. After disputed charges were "recoursed" to AT & T, NYTel was required to delete the disputed charges from all future billings to CPI.

Under the governing Public Service Commission tariffs, NYTel has the right to terminate service to a customer for non-payment of local charges. However, it is undisputed that the tariffs do not permit NYTel to terminate or interrupt service (i) for non-payment of disputed AT & T long-distance charges or (ii) for non-payment of local service charges which are disputed by NYTel's customer. Moreover, the tariffs do not permit termination unless NYTel has first notified its customer in writing of the amount required to be paid to avoid termination.

### Chronology of Events

During the spring of 1989 CPI was engaged in negotiations with American Teltronics Inc. ("ATI"), another independent COCOT vendor, and GTE Communications Systems ("GTE"), a manufacturer of coin-operated telephones. These negotiations reached fruition in July 1989. A July 12, 1989 letter of intent from ATI to CPI stated, *inter alia*, that the two companies would merge and ATI would arrange a cash infusion of $1,600,000 into the new company. This would be used, in part, for payment in full of CPI's indebtedness to NYTel for local service charges which CPI believed, and had represented to ATI, aggregated approximately $600,000. A "Memorandum of Intent" dated July 20, 1989 was signed on the morning of that day by GTE, ATI and CPI at the GTE headquarters in Stamford, Connecticut. GTE was CPI's largest creditor and the manufacturer of a large number of the CPI COCOTs, which had been experiencing operational difficulties. In the Memorandum of Intent the three parties agreed "to mutually assist each party in the culmination of a business combination between ATI and CPI", and stated that GTE would "negotiate a satisfactory resolution of any disputes with Coin Phones, Inc." Richard Coghlin, President of ATI, testified that it was contemplated that the merged ATI/CPI entity "would become a GTE flagship for the Northeast Corridor [and] that we would be the authorized distributor of the GTE product line".

CPI and NYTel had a history of dispute and uncertainty regarding two aspects of NYTel's billings to CPI. One source of conflict was NYTel's billing of AT & T long-distance charges. Despite the blocking and screening services requested by CPI, NYTel routinely billed CPI for large volumes of AT & T long-distance charges aggregating more than $3 million during the period from December 1987 to July 1989 (the "pre-petition AT & T charges"). CPI took the position that it would refuse to acknowledge the validity of or pay for *any* AT & T long-distance charges, with de minimis exceptions long preceding the events in question. CPI routinely protested the AT & T charges and sent monthly or periodic "credit reports" de-

tailing the disputed AT & T long-distance charges. The record establishes clearly that the responsible NYTel officials had full knowledge for months prior to July 20, 1989 that CPI disputed, rejected and refused to pay for *all* AT & T long-distance charges. Thus, all of the AT & T charges should have been "recoursed" to AT & T, eliminated from NYTel's billings to CPI and eliminated as a source of dispute between the parties. But the AT & T charges were not "recoursed" to AT & T, and NYTel continued to demand payment of these charges from CPI.

The parties also disagreed with respect to the amount owed by CPI to NYTel. Startlingly, part of the problem was that CPI could not ascertain from NYTel how much NYTel claimed CPI owed for local service charges. The matter came to a head in July 1989. Eric Fiebert, the Chairman, Chief Financial Officer, Treasurer and one of the founding shareholders of CPI, and Lee Karson, CPI's general manager, met with NYTel representatives shortly before July 14 to discuss CPI's approximately $600,000 debt to NYTel, and to try to negotiate payments over time. The NYTel representatives rejected any deferred payment scheme but did not then take issue with the total amount owed. On July 14 NYTel's business office manager, Joanne Quattrone, wrote a notice of termination letter to CPI confirming a telephone conversation that day (the "July 14 Letter"). Because of the importance of this document, it is reproduced here in full:

> This letter will confirm our conversation of July 14, 1989 regarding the outstanding charges in the amount of $581,106.06 for all your 859 COCOT accounts. This total represents the amount your corporation is stating is due New York Telephone. New York Telephone's figures are substianally [sic] higher. We will continue to review all your claims and process credits that are due on your accounts.

> The following date is important to you. Payment of the full amount for telephone service is required by 5:00 P.M. on July 24, 1989 to avoid interruption of your service on the following business day. Ten days later your service will be disconnected. If your service is interrupted, a $76.50 charge

to restore it will apply and a deposit or an additional deposit may be required.

> Unless the full amount is paid prior to disconnection of your service we would have no choice but to cancel your account. This would result in a new connection charge and possibly a deposit to reestablish service.

> You can avoid this inconvenience by paying promptly.

> If I can be of any assistance, please don't hesitate to call me on (212) 997–0548.

Thus, on July 14 NYTel told CPI that it faced "interruption" and thereafter "disconnect[ion]" of its service if payment of the "full amount" for telephone service was not made by 5:00 P.M. on July 24, without telling CPI what the "full amount" was except that it was "substantially higher" than $581,-106.06. The threat of interruption of service was a mortal threat to CPI. Aside from the obvious fact that CPI could not derive any income from its assets if service were interrupted, witnesses for both parties testified, based upon experience, that a coin-operated telephone which is inoperable for any reason will almost certainly be vandalized, destroyed or physically removed by frustrated would-be users or by the location owner within a few days.

Since the amount of CPI's debt to NYTel was critical to CPI's prospective merger partner ATI, which had to provide funding for the full amount owed to NYTel, CPI requested a meeting with NYTel at which representatives of ATI would be present for the purpose of resolving CPI's indebtedness. The meeting was scheduled for the afternoon of July 20, 1989. Prior to the meeting the responsible NYTel officials had been informed and understood (i) the purpose of the meeting, (ii) the fact that representatives of ATI would attend the meeting and (iii) that a proposed transaction was contemplated between CPI and ATI under which the latter would provide the funding necessary to enable CPI to pay its indebtedness to NYTel.

As will be amplified below, the testimony of the witnesses called by the Trustee concerning the July 20 meeting conflicted sharply with the testimony of the NYTel witnesses. The Trustee's witnesses testified,

and the parties have stipulated, that the NYTel representatives said CPI owed NYTel between $3 million and $6 million and that service on all CPI's lines would be terminated if substantial payment were not made in four days. The NYTel witnesses testified that they said that CPI owed on account of local service charges some amount exceeding $1 million. Suffice it here to state that NYTel's witnesses Maureen Feeney, Director of Billing and Collections, and Joanne Quattrone, General Business Manager, unequivocally confirmed the following facts at trial: both reviewed and approved the July 14 letter; the July 14 letter meant exactly what it said, namely, that CPI's service would be interrupted if payment of the "full amount" owed by CPI to NYTel was not made by July 24; at the July 20 meeting the NYTel representatives communicated unequivocally to the CPI and ATI representatives that all service to CPI would be terminated if arrangements to pay some amount in the range of $1 million were not made by July 24, which was not an idle threat and was intended by the NYTel representatives to be taken at face value by the CPI and ATI representatives.

Thus, by the testimony of NYTel's own witnesses, at the end of the July 20 meeting CPI found itself faced with the certainty of interruption of its service on July 25 if it did not pay an unspecified amount of approximately $1 million. As a consequence of the July 20 meeting, both ATI and GTE terminated their agreements in principle with CPI, since the amount CPI allegedly owed NYTel, although still unspecified, far exceeded what CPI had told ATI. CPI did not have funds to pay even the $581,106.06 it believed was due NYTel, which it expected to receive from ATI in the merger. Faced with the destruction of its business by the impending interruption of service, on July 21 CPI filed its petition under Chapter 11, thereby invoking the automatic stay to preclude NYTel from terminating service.

Following July 21, 1989 CPI continued in business as debtor-in-possession and ATI took over as managing agent of CPI's business in the hope that the business could be salvaged and the proposed transactions with ATI and GTE revived in some form. However, the billing problems with NYTel continued as before. During the post-petition period, NYTel billed CPI approximately $234,000 for AT & T long-distance charges (the "AT & T post-petition charges"). In addition, during the post-petition period CPI disputed NYTel local service charges (i) on former CPI lines which CPI had instructed NYTel to terminate and (ii) on lines which were owned by NYTel, rather than CPI. Moreover, NYTel followed the practice of rendering separate monthly invoices for each of CPI's COCOT lines, rather than aggregate invoices covering all of the lines, although NYTel had the capacity to do aggregate billing. And in a number of instances NYTel terminated service on CPI lines without any request by CPI to do so, including the blanket shutdown of 109 lines which were supposed to have been assigned to ATI and were the subject of heated debate at the July 20 meeting.

Because of the large incidence of disputed items, both long-distance and local service, the large volume and material amounts of the disputed items and the huge number of separate bills that were required to be scrutinized monthly, ATI found that the staffing required to monitor CPI's billing problems with NYTel became overwhelming. ATI ultimately withdrew as managing agent of CPI. CPI abandoned its attempt to reorganize and the case was converted to Chapter 7.

### Certain Factual Issues

Before turning to a legal analysis of the Trustee's claims and application of the facts to the law, it will facilitate matters to resolve certain factual issues arising from the evidence and the parties' contentions. The issues arise in the context of the following topics, discussed below:

- Whether, and when, CPI requested blocking and screening services, and what services were requested

- The impact of blocking and screening failures

- The amount CPI owed to NYTel

- The July 20 meeting

### Blocking and Screening Services

Unauthorized or fraudulent long-distance toll charges on coin-operated telephone lines were recognized by all as an extremely serious problem in the COCOT business. This is evident from one of the competitive brochures distributed by NYTel to prospective COCOT location owners (*e.g.*, owners of bodegas, shops or drugstores). One such brochure, under the heading "Compare these differences" between NYTel coin phone service and COCOTs offered by independent vendors, stated that if the location owner used NYTel coin-operated telephones:

> You won't ever be billed for long-distance charges incurred. And, furthermore, we absorb the cost of all fraudulent calls.

Recognizing the gravity of the toll fraud problem, NYTel offered its COCOT vendor customers various blocking and screening services as they became available. The blocking and screening services involved in this proceeding are the following:

*"PIC–NONE".* In selecting public access line telephone service from NYTel, COCOT vendors such as CPI had the option to select a primary interexchange carrier ("PIC") and this PIC selection must be implemented by NYTel. The selection of "PIC-none" indicates that *no* primary interexchange carrier had been selected and, accordingly, a directly dialed long-distance call (*i.e.*, a call placed without the use of an access code for any interexchange carrier), should *not* be delivered to the interexchange carrier by NYTel if the PIC-none selection were properly implemented.

*Originating call screening ("OCS").* This was a screening service available from NYTel which allowed a COCOT vendor to advise the interexchange carriers of the COCOT vendor's order that the billing options available to the user of the telephone line be restricted, so that if a caller attempted to originate an operator-handled call from a COCOT vendor's line, OCS enabled the interexchange operator to preclude billing to the originating line.

*Billed number screening ("BNS").* This was a screening device available from NYTel which allowed a COCOT vendor to advise domestic interexchange operators of the vendor's instruction to restrict collect and third-number billing of calls to that telephone line.

*10XXX restriction.* This blocking service prevented access from a COCOT line to interexchange carriers such as AT & T through dialing "1–0–X–X–X" access codes.

OCS and BNS were available since prior to 1988 free of charge to COCOT vendors who requested these procedures for their lines. The 10XXX blocking procedure became available in the New York metropolitan area in September 1988. Existing COCOT lines were charged approximately $80 by NYTel for 10XXX installation, but there was no charge on new COCOT lines if the procedure was requested. The PIC selection and blocking and screening services described above were to be implemented by NYTel upon the request of a COCOT vendor such as CPI.

CPI selected long-distance carriers other than AT & T on a few of its lines. For the great majority of its lines, however, CPI instructed NYTel to implement the PIC-none blocking procedure, because AT & T would not utilize any security codes to assist in fraud protection and, unlike other long-distance carriers, AT & T would not provide COCOT vendors with any commissions on long-distance calls.

I accept Mr. Fiebert's testimony, corroborated by documentary evidence, that he specifically ordered all of the blocking and screening procedures described above, namely, PIC-none, BNS, OCS and 10XXX, to be implemented as soon as those services became available. I also accept the testimony of Mr. Richard Coghlin, President of ATI, that after the filing of CPI's Chapter 11 petition on July 21, 1989 ATI demanded that NYTel implement every blocking and screening service available for both ATI and CPI lines.

NYTel called no witness from its service order department, which handled customer orders for screening and blocking procedures, and no witness who purported to have any personal knowledge on the question

whether the CPI lines had, or were supposed to have, the available screening and blocking protections. Nor did NYTel produce any documentary evidence purporting to demonstrate that the CPI lines did not have the screening and blocking procedures. I reject the testimony of NYTel's witness Joanne Quattrone concerning a purported telephone conversation with CPI's former general manager Lee Karson in which, according to Ms. Quattrone, Mr. Karson admitted that CPI did not have PIC-none or 10XXX protection. Ms. Quattrone's testimony in this regard is refuted by documentary evidence and is inconsistent with her prior deposition testimony (read at trial).

Based upon all of the evidence, I find that CPI requested, and NYTel was required to provide, the blocking and screening services known as PIC-none, BNS, OCS and 10XXX as those services became available.[1]

### *The Impact of Blocking and Screening Failures*

To assess the impact of failure to implement or properly operate the blocking and screening services, one must first determine what their collective efficacy would have been had the services been requested, implemented and properly operated. As a defendant in this adversary proceeding, AT & T entered into a stipulation of facts with NYTel containing the following statements:

1. AT & T's records indicate based upon comments from the LEC [NYTel] that on a number of occasions, calls were placed through the AT & T network as a result of the failure of certain selection, screening, and/or blocking features (i.e., pic-none failure, Code 88 failure, 10–X–X–X blocking failure) or that NYTel alleged that certain screening features were not in place. (Exhibit 40 at p. 4, ¶ 1)

s. Both AT & T's pre-petition charges and AT & T's post-petition charges would have been significantly reduced or virtually eliminated if the screening and blocking selections identified in paragraphs "1c, 1d and 1e" above [i.e., PIC-none, BNS, OCS and 10XXX] had been implemented and were operating properly. (Exhibit 40 at pp. 6–7 ¶ s)

CPI asserts that this stipulation constitutes a judicial admission by AT & T which may be admitted into evidence and used against NYTel, citing Federal Rule of Evidence 801(d)(2)(C) and *Ben–Tom Supply Company, Inc. v. V.N. Green & Company, Inc.*, 338 F.Supp. 59, 64 (S.D.W.Va.1971). NYTel responds that the stipulation is a self-serving assertion by the Trustee and AT & T that NYTel was at fault; that the *Ben–Tom Supply Co.* case invoked a rule that applies only to parties having an identity of interest which NYTel and AT & T do not have on the question whether NYTel was at fault; and that the stipulation is inadmissible hearsay as to NYTel, citing Federal Rules of Evidence 801(d)(2) and 802. NYTel then goes on to present a number of arguments in support of the proposition that "the combination of PIC–None, OCS, and BNS, even if all of them were ordered by plaintiff and were working perfectly, did not guarantee that no AT & T charges would appear on plaintiff's telephone bills" (NYTel Post–Trial Memo at 8).

First, NYTel asserts that "as plaintiff's Mr. Fiebert admitted, some of plaintiff's customers did select AT & T as their long-distance company" (*id.*). The argument carries little force, however, since AT & T was the long-distance carrier for only five or six CPI lines long before the events in question, and then "[o]nly for a short period of time; probably six months" (9/18/95 Trial Tr. 10).

---

1. NYTel argued that the testimony of Mr. Karson raised a question whether CPI agreed to pay an $80 per line charge for the 10XXX service. If germane to the outcome, I would credit the testimony of Mr. Fiebert that he requested 10XXX and that NYTel billed the $80 charge for all of CPI's lines. However, the issue is significant only during the post-petition period after July 21, 1989. Post-petition CPI as debtor-in-possession constituted a new customer with a new billing account and a new security deposit. *See* NYTel's trial counsel 9/20 Tr. 17; Quattrone 9/22 Tr. 93–94. Under the governing Public Service Commission tariff, no connection charge was applicable to new customers. *See* Exhibit J–1, last sheet. Accordingly, NYTel was required to implement all of the blocking and screening services including 10XXX on all of CPI's lines after July 21, 1989.

Second and third, NYTel argues that OCS and BNS "did not physically prevent" operator-assisted calls or collect calls from being billed to a COCOT line "[i]f the OAS provider disregarded this information ..." (in the case of OCS) or "[i]f the service provider did not consult the database" (in the case of BNS) (NYTel Post–Trial Memo at 9). None of the witnesses relied upon by NYTel for these assertions was qualified as knowledgeable on the workings of OCS and BNS. Their testimony, even if reliable, has little significance in the absence of any evidence suggesting that in fact any long-distance calls were billed to CPI COCOTs because a telephone operator "disregarded" or "did not consult" the OCS or BNS screening/blocking instruction. Moreover, official NYTel tariff documents offered in evidence at the trial (Exhibit J–1, first sheet) do not make any reference to such lacunae in OCS and BNS.

Fourth, there was testimony that BNS did not prevent collect and third-number calls originating from the Caribbean ("809" area code) from being charged to domestic COCOTs because the BNS database was not consulted by telephone companies there. However, there was no documentation of the incidence of area code "809" calls billed to CPI COCOTs.

Fifth, until the advent of 10XXX blocking, callers could make AT & T long-distance calls from COCOT telephones by dialing "10288" ("10ATT"). With regard to efficacy of 10XXX blocking, the NYTel official tariff document (Exhibit J–1, first sheet) states categorically that "[t]his optional feature, known as 10XXX Restrict, prevents access to an interexchange carrier through the dialing of a 10XXX access code."

For purposes of this decision, the Court assumes (without deciding) that the AT & T stipulation is not admissible against NYTel as a judicial admission. Nevertheless, based upon the stipulated descriptions of the blocking and screening services at issue, the descriptions of OCS, BNS and 10XXX in the official NYTel tariff publication (Exhibit J–1), the conceded purpose of those services to block and screen calls and prevent long-distance charges, and the lack of any competent evidence suggesting that any of those services would not accomplish its objective when properly installed and operational, I make the following finding of fact: that the post-petition AT & T charges to CPI's lines aggregating some $234,000 would have been significantly reduced or virtually eliminated if the screening and blocking procedures requested by CPI, namely, PIC-none, OCS, BNS and 10XXX, had been implemented by NYTel and were operating properly.

A similar finding would be warranted with respect to the pre-petition AT & T charges if the finding were necessary to decide the case. However, unlike the post-petition charges, the pre-petition AT & T charges are not claimed to have been a factor which in and of themselves caused damage to CPI. Accordingly, it is unnecessary to address the question whether the pre-petition AT & T charges were the product of NYTel's gross negligence or intentional misconduct.

### The Amount Owed to NYTel

One of the bizarre aspects of this case is that at the time of the events in question NYTel did not know how much was owed by CPI to NYTel on account of local service charges. NYTel has never filed a proof of claim in this case, and even at trial NYTel had not determined the amount it claimed pre-petition from CPI.

There is no dispute that CPI had calculated and believed it owed NYTel the precise sum of $581,106.06 on account of local service charges. See the July 14 letter set forth above. The figure was based on CPI's books and records according to the testimony of its chief financial officer, Mr. Fiebert, which this Court has found to be entirely credible. CPI's books and records had been audited by Arthur Andersen on behalf of GTE (in connection with a prospective transaction) and by CPI's own accountants, J.H. Cohen, and no questions had been raised by anyone regarding CPI's indebtedness to NYTel, even in response to the accountants' requests for confirmation sent to NYTel.

At the trial NYTel presented conflicting testimony as to the amount of CPI's debt to NYTel in July 1989. Ms. Feeney initially

testified that CPI owed NYTel $581,106.06, mistakenly characterizing CPI's figure as NYTel's figure. She then testified several times that the amount owed NYTel was $1,200,000 "rounded off". This was based upon her recollection of handwritten documentation prepared in July 1989 by a team of up to six employees using computer screens to determine and manually write down the amount shown on NYTel's computer database for each of the separate accounts maintained for the approximately 1,000 CPI COCOT lines. None of the six employees was called as a witness. Ms. Feeney did not see any tally of the total amount reflected on these handwritten sheets, and she did not know what disposition was made of the sheets, which were never produced in discovery and apparently no longer exist. Later, Ms. Feeney's recollection was "refreshed" by a document, Exhibit 32, and she testified that the amount owed by CPI to NYTel on account of local service charges was $1,031,000.

Ms. Quattrone testified that the CPI prepetition debt to NYTel was approximately $1 million. Ms. Quattrone based her testimony on a 47–page handwritten document which she prepared in October or November 1989, Exhibit U, containing one column headed "Pre–DIP" written in her handwriting. Ms. Quattrone derived the figures in the "Pre–DIP" column by taking the amounts shown as billed and unpaid from the computer screen from NYTel's computer database for each of the CPI COCOT accounts. Unfortunately, no hard copy exists of NYTel's pre–1990 computer database, and the entire database for the CPI billing accounts was purged from the system in early 1990 and no longer exists. Accordingly, Exhibit U was excluded from evidence under Federal Rule of Evidence 1006. Exhibit 32, used to refresh Ms. Feeney's recollection of the $1,031,000 figure, was taken from Exhibit U and, accordingly, that document also was inadmissible.

Thus, CPI posits its debt to NYTel for local service charges in mid-July 1989 at $581,106.06. NYTel counters that the debt was either approximately $1,200,000, based upon Ms. Feeney's recollection of the handwritten work product produced by a team of workers in July 1989, or approximately $1 million, based upon Exhibit U prepared by Ms. Quattrone in October–November 1989. The evidence supports only one possible explanation for the radical difference between the parties' figures—the inclusion of AT & T long-distance charges in the NYTel computer databases for the CPI accounts. There can be no doubt that CPI's computer records deleted all of the AT & T charges. It is equally certain that some of the AT & T charges were not removed from the NYTel computer database. Ms. Mary Burns, an NYTel employee, testified in deposition as follows:

> Q. Is this [the "Pre–DIP" column on Exhibit U] the amount that is due to New York Tel only or does it include long-distance charges that would be for AT & T?
>
> A. I believe these amounts include what was on the bill which would include amounts—any amounts billed by New York Tel for any other carrier which would include AT & T for any amount that is due. (9/22 Tr. 103)

This testimony is confirmed by Ms. Feeney and Ms. Quattrone. Both testified, in substance, that NYTel would not delete the AT & T charges from NYTel bills until the charges had been "recoursed" to AT & T, and it was clear from their testimony and that of the AT & T witness, Nikolaus Kecks, that few of the AT & T charges had been recoursed by NYTel at the time of the July 20 meeting. In her deposition read at trial, when asked why she did not separate NYTel from AT & T charges when she wrote the July 14 letter to CPI, Ms. Quattrone responded:

> A. Because at that time I didn't know that would be the only figure due the customer would be to New York Telephone. I had no way of knowing he did not owe the long-distance piece of it. When we do the bill, we do it in total as a total bill. We wouldn't split ours unless we knew he wasn't paying those charges or he was going to get credit for them. So that is why I did not put the figure in there. (Quattrone 9/22 Tr. 170; *see also id.* at 172–175)

The source of the conflicting figures on both sides was the computer database of each company. Ultimately, "proof" of any specific figure, be it $581,106.06 or approximately $1 million or $1.2 million, depended upon an audit of the underlying account data maintained in the computer database for each company. The undisputed facts are that (i) CPI alone calculated the precise amount of its debt to NYTel, (ii) NYTel has never contended that it was denied an opportunity to audit CPI's database or that the CPI figure was not substantiated by its database or that the database was wrong in any respect, (iii) the NYTel database included unrecoursed amounts for AT & T long-distance charges and the database was purged by NYTel in early 1990, thereby depriving CPI of any opportunity to audit NYTel's imprecise and inconsistent claims as to the CPI debt.

Under the circumstances, I have no hesitation in finding that CPI has sustained its burden of proving by a preponderance of the credible evidence that CPI was indebted to NYTel in the amount of approximately $581,-000 in mid-July 1989.

### The July 20 Meeting

The seminal event in this controversy is the July 20 meeting. There is no dispute that the meeting was requested by CPI and that the purpose of the meeting was to enable CPI's prospective merger partner, ATI, to negotiate with NYTel a resolution and payment of CPI's outstanding debt to NYTel, for which ATI was going to provide funding.

In view of the astonishing divergence in recollections, it will facilitate understanding of the Court's findings to quote from or summarize the relevant testimony of the witnesses concerning the July 20 meeting.

According to Mr. Coghlin, at the outset of the meeting the NYTel representatives refused to discuss the CPI bill, saying it was proprietary and confidential information of NYTel's customer which could not be disclosed. Mr. Karson and Mr. Coghlin responded that ATI was the proposed merger partner of CPI, that ATI was going to put in a cash infusion and wanted to negotiate on the telephone bill (Coghlin 9/15 Tr. 85–86). Mr. Coghlin then testified as follows:

A New York Telephone said that the bill was between three and six million dollars and if it wasn't paid the lines were going to be terminated. I do not recall the number of days or for weeks, which it wasn't. It was a very short window; five days, ten days; something like that. Extremely short window.

Lee Carson [sic] from Coin Phones was upset and he said, no, that is not true. It is between 580/600 thousand dollars. Joanne Catrone [sic] called him a liar and said that she had been discussing this bill with him repeatedly and that he had made arrangements to make payments but he never made the payments and he lies all the time and that he knew better that the bill was between three and six million dollars.

Q Did New York Telephone produce any records to substantiate their claim of a three million to six million dollar bill?

A Well, this clerical person, Debbie Phillips, was sitting there. She had a manila folder that was perhaps half an inch thick and Joanne Catrone [sic] referred to that folder. Lee Carson [sic] wanted to see documentation but it was never provided. At some point, Debbie Phillips was told to explain how the bill was as high as it was.

She took a couple of sheets of paper out and she would refer to an exchange. An exchange is what happens after an area code. Like area code 212 and 946. So 946 would be the exchange. She would rattle of [sic] an exchange as an example, 946, you owe $287,000 for that exchange. Then she would throw out another exchange and an additional odd amount of money and then just—

Joanne and Maureen Feeney at that point in time said that it is three to six million dollars and we are going to terminate service if it is not paid.

Counsel then intervened and verified that they are going to shut off the phone service.

The meeting was total chaos. There was shouting going on between Lee Carson [sic] and Joanne Catrone [sic]. At that

same time we were then informed by either Joanne Catrone [sic] or Maureen Feeney, I forget which, that the last two batches of phones that we had purchased and sent the authorizatin [sic] to transfer the lines for billing purposes from Coin Phones over to us that we spent approximately $170,000 for were not transferred and they would not be transferred and they going to be shut down.

With that, the meeting was out of hand. I asked Lee Carson [sic] to please leave the room because all they were doing was pointing out and calling him a liar. So nothing was going to be accomplished with him in that room.

At that point in time, my only concern had nothing to do with the merger. I was trying to salvage [109 COCOT lines which had recently been sold by CPI to ATI for $170,000]. (*Id.* at 86–88)

Mr. Coghlin said the NYTel representatives did not attempt to identify any portion of the $3 to $6 million bill as constituting long-distance charges, and Mr. Coghlin understood the amounts to refer to NYTel charges (*id.* at 89). After being told that CPI's service would be terminated if some amount between $3 million and $6 million were not paid within a few days *and* that the shutdown would include the 109 lines which ATI had most recently purchased from CPI, which NYTel had not yet transferred to ATI's account, Mr. Coghlin's reaction was "[t]otal shock; absolute shock" and his focus turned solely to protection of the 109 lines which ATI had recently purchased (*id.* at 88). The NYTel representatives were adamant that service on the 109 lines would be terminated within a matter of days if ATI did not pay the outstanding debt attributable to those lines, but they did not know and could not tell Mr. Coghlin how much ATI would have to pay to avoid the termination (*id.* at 93). There was no mention of a bankruptcy filing by CPI.

Mr. Coghlin's testimony was confirmed by that of Russell Stern, Chairman of ATI. Mr. Stern testified as follows:

A Well, we met with New York Telephone almost immediately after we met with GTE. I didn't meet with them. Dick Coghlin met with them. And Dick Coghlin notified us immediately that $600,000 or less figure was really a figure of somewhere between three and six million dollars. New York Telephone couldn't put a figure on just exactly what it was.

Q And as a result of the three to six million dollar figure, what had happened?

A When we reviewed our model, it became easily understandable that was an uneconomic merger and we could not go forward with it and we told Dick Coghlin to scrub the merger. (Stern 9/18 Tr. 214–215)

\* \* \* \* \* \*

Q Did you receive any other information from New York Tel regarding and [sic] COCOTs that ATI had purchased from Coin Phones?

A Yes; we did. That was the other surprising development at the meeting on July 20th. They in effect said that they wanted immediate payment somewhere in that three to six million dollar range. Frankly, they were going to shut off or terminate the lines that Coin Phones had. We also learned that they were going to shut down 109 of our phones which we had purchased with our cash and that had not been transferred yet. (*Id.* at 215–216)

\* \* \* \* \* \*

Q Did Mr. Coghlin tell you what went on at the [July 20] meeting?

A Just informed us that there was a demand for immediate payment of three to six million dollars.

Q And he told you that entire amount, three to six million, had to be paid in full?

A That was what we understood from his comments. (*Id.* at 232–233)

Those portions of the deposition of Lee Karson read into the record at the trial by counsel for both sides substantially corroborated Mr. Coghlin's testimony. Mr. Karson confirmed that at the very outset of the July 20 meeting the NYTel representatives said that the amount owed by CPI was between $3 million and $6 million, with the threat of imminent termination of service for non-payment, that the meeting immediately turned

into chaos with shouting and accusations by Pat Haynes of ATI that Mr. Karson was "a liar, a thief, a scoundrel, a fraud" (9/26 Tr. 16) and that Mr. Karson was thereupon asked to and did leave the meeting.

As a consequence of the July 20 meeting, GTE faxed a letter dated July 21, 1989 to Lee Karson and Richard Coghlin stating, in part, as follows:

> Prior to signing the memorandum of intent [dated July 20, 1989 between GTE, ATI and CPI], it was represented by CPI that its outstanding debt to NYNEX was approximately $581,000. One reason for the preparation of the memorandum of intent on July 20, 1989, was so that ATI and CPI could present it to NYNEX to show that the parties were in good faith working to resolve the CPI difficulties, and that there would be a basis under which the business could go forward.
>
> We understand from NYNEX that when ATI and CPI visited NYNEX on the afternoon of July 20, 1989, NYNEX indicated that the outstanding debt owed by CPI was somewhere between $3 million and $6 million dollars. This is a substantial and material change in the facts, and in our view, raises serious doubts as to whether a business combination between ATI and CPI will be possible as was contemplated when the parties signed the memorandum of intent dated July 20, 1989.
>
> Accordingly, GTE Supply hereby revokes its consent that ATI operate the phone locations of CPI which are leased from GTE Leasing and which are referred to in the July 20, 1989 memorandum of intent, effective immediately. (Exhibit 18) [2]

Paragraph 19 of the "Undisputed Facts" section of the Pretrial Order states as follows:

> 19. On or about July 20, 1989, in the presence of ATI, NYTel advised CPI that the total outstanding phone bill owed by CPI was between $3,000,000 to $6,000,000, and unless a significant payment was made within a few days, CPI's telephone service would be interrupted.

NYTel's first witness was Thomas Lagreca, an attorney formerly employed by NYTel. Although he attended the July 20 meeting, Mr. Lagreca's recollection of that event was virtually non-existent. No finding of fact could be predicated on or fortified by his testimony.

NYTel's next witness was Joanne Quattrone, Business Office Manager. Ms. Quattrone's recollection of the July 20 meeting was vague and uncertain, and began with the words "I don't remember" in response to the question "Who said what?" (Quattrone 9/22 Tr. 82). She said it was just an ordinary business meeting and did not recall any shouting, name calling or exclusion of Mr. Karson. She referred to some discussion to the effect that NYTel was not at liberty to forgive the indebtedness to AT & T (id. at 83). When asked whether there was discussion regarding the amount of the NYTel bill, Ms. Quattrone answered:

> A When it was mentioned that it was a million dollars, Mr. Coghlan [sic] was very surprised because that was not the figure that he received from Mr. Carson [sic]. (Id. at 84)

With respect to the discussion of partial payment, Ms. Quattrone said:

> And New York Tel is expected to be paid in full for its own debts. We would not take a partial payment. (Id. at 83)

She recalled that after about half an hour Messrs. Coghlin, Haynes and Karson interrupted the meeting to have a private conference among themselves in the hallway. Following the interruption, all three returned to the meeting room and Mr. Karson "told us they were not going to pay the bills and that they would file bankruptcy" (id. at 86). Ms. Quattrone had a vague recollection of some discussion concerning the 109 lines that had been transferred to ATI (id. at 87). In response to the question "Were any bills presented, in summary form or in any other way?", Ms. Quattrone answered "Not that I am aware of; no" (id. at 87). After Mr. Karson stated that CPI would file bankrupt-

---

**2.** This document was received in evidence subject to a hearsay objection with respect to the first sentence of the second quoted paragraph. Accordingly, that sentence is not received for the truth of the facts asserted therein.

cy, the meeting was concluded. Ms. Quattrone said that at the end of the meeting there was no offer made to reduce the amount of the NYTel indebtedness. Responding to questions by the Court, Ms. Quattrone testified, somewhat inconsistently:

We told them if the bills were not paid service would be interrupted on the date in the letter [referring to the July 14 letter, Exhibit 15]. (*Id.* at 91)

\* \* \* \* \* \*

THE COURT: So is it your testimony then at the July 20th meeting you—and by "you" I mean you personally—told CPI and the ATI representatives that if payment of the full amount of CPI's telephone charges was not made by July 24th that service on all of CPI's lines would be terminated the following day?

THE WITNESS: That's correct, Your Honor.

THE COURT: And that included the 109 lines that were claimed to have been transferred to ATI?

THE WITNESS: Yes, Your Honor. They were still CPI; yes.

THE COURT: Alright; now it says payment of the full amount in your letter. My question now is was there any discussion at the July 20th meeting with regard to what amount had to be paid by July 24th in order to avoid an interruption of service?

THE WITNESS: It was discussed that it was one million dollars that was due but we would work payment arrangements with them to pay it off.

THE COURT: I would like to know what they were told—what they had to do to avoid interruption of service?

THE WITNESS: They would have to make full restitution or substantial payment arrangements that would be satisfactory to reduce the liability down. And we would be willing to work with them. (*Id.* at 91–92)

The testimony of Ms. Feeney was not materially different from that of Ms. Quattrone. With respect to the conversation concerning the 109 lines which ATI had acquired from CPI, Ms. Feeney testified:

I gave him [Mr. Coghlin] his options. He would have to pay the amounts in full. We would then do a transfer to ATI or we would do a transfer if ATI would assume all of the outstanding charges on the accounts and/or we would have to terminate all the accounts. Basically that was it; either pay the bill or they would have to be terminated. (9/22 Trial Tr. 273–274)

Ms. Feeney testified that NYTel advised those present on July 20 that CPI owed approximately $1 million for the NYTel portion of the bill (*id.* at 275). Ms. Feeney was equally clear as to the consequence of failure to pay the entire amount owed by CPI to NYTel. She stated:

THE COURT: What was said at the July 20th meeting with regard to—what was said if anything at the July 20th meeting with regard to the possibility of New York Tel interrupting Coin Phones service at its COCOT installations?

THE WITNESS: If the bill was not paid the service would be interrupted. (*Id.* at 354)

In many respects the NYTel witnesses appeared to be recalling a different meeting from that described by Messrs. Fiebert and Karson. The witnesses were consistent only in stating that payment of the full amount demanded by NYTel ($3–$6 million according to Fiebert and Karson; approximately $1 million or $1.2 million, according to Quattrone and Feeney) would have to be made promptly to avoid termination of service.

Based upon all of the evidence, including Undisputed Facts paragraph 19 of the Pretrial Order, I make the following findings. At the July 20 meeting, in the presence of ATI, NYTel advised CPI that the total outstanding phone bill owed by CPI was between $3 million and $6 million, and "if the bill was not paid" within a few days, CPI's telephone service would be interrupted and, within a few days thereafter, the accounts terminated. The NYTel personnel did not break out any portion of the $3–$6 million as AT & T charges. Like the July 14 letter, the statements by the NYTel representatives at the July 20 meeting were statements of firm intention by the Company and not threats for

negotiating purposes. The NYTel statements were made with the intention and understanding that they would be accepted and relied upon by the CPI and ATI representatives, and the statements were accepted and relied upon by ATI and CPI.

### Discussion and Conclusions

#### I. Negligent Misrepresentation

▮ The Trustee's first claim is based upon negligent misrepresentation. Stated concisely, it is the Trustee's position that the NYTel representatives at the July 20 meeting falsely represented that CPI was indebted to NYTel for some amount materially in excess of the actual indebtedness; that NYTel would (and, impliedly, had the legal right to) terminate all service to CPI if the alleged indebtedness was not promptly paid; and that as a direct consequence ATI and GTE repudiated their agreements in principle with CPI and CPI was required to file for bankruptcy in order to prevent the prompt destruction of its business.

▮ The elements of a claim for negligent misrepresentation under New York law may be summarized as follows:

(1) a report, statement or representation by the defendant which is materially misleading or false;

(2) awareness on the part of the defendant that the representation is to be acted or relied upon by the plaintiff or by others with effect upon the plaintiff;

(3) economic injury to the plaintiff;

(4) causal relationship between the misrepresentation and the damage, often expressed in terms of "reliance" on the part of the plaintiff;

(5) a contractual or other relationship between the plaintiff and defendant such that the defendant has a duty to the plaintiff to exercise care in making the statement, report or representation.

*See Ossining Union Free School District v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 425, 541 N.Y.S.2d 335, 339, 539 N.E.2d 91, 95 (1989); *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 442–43, 483 N.E.2d 110, 117–18 (1985); *International Products Co. v. Erie R.*

*Co.,* 244 N.Y. 331, 338, 155 N.E. 662, *cert. denied,* 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927). The New York Court of Appeals has articulated the claim most clearly and succinctly as follows:

> Generally, a negligent statement may be the basis for recovery of damages where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, ... but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all.

*White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977). *See also, Courteen Seed Co. v. Hong Kong & Shanghai Banking Corp.,* 245 N.Y. 377, 381–82, 157 N.E. 272 (1927); *Glanzer v. Shepard,* 233 N.Y. 236, 238–39, 135 N.E. 275 (1922).

#### The requisite relationship

▮ NYTel argues that the negligent misrepresentation claim must fail because it had no fiduciary relationship with CPI as purportedly required under New York law, citing *Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir.1992), where the Court said "[u]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes [it] a fiduciary duty." In the *Stewart* case, the Court of Appeals held that a complaint stated a valid cause of action sounding in fraud. The Court made the quoted statement in affirming the district court's dismissal of a negligent misrepresentation claim. However, the New York state courts do not require the existence of a "fiduciary" relationship to support a negligent misrepresentation claim. The Circuit Court in *Stewart* cited *White v. Guarente,* quoted above, which merely required that the false statement be made "to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all." Under the doctrine of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal

courts must look to rules of law as articulated by the state courts. *Lund v. Chemical Bank,* 1990 WL 17711, *2 (S.D.N.Y.1990).

Was there "some relation of duty, arising out of contract or otherwise" between NYTel and CPI such as to require NYTel to act with care? Unquestionably. The "relationship" was that of contracting parties. Irrespective of the implied covenant of good faith and fair dealing, discussed below, the relationship of contract without more is sufficient to give rise to a duty of reasonable care in a matter going to the essence of the contract. It is unthinkable that a contracting party is at liberty to terminate or announce termination of its contractual undertaking for nonpayment by the other party with no corresponding duty to exercise reasonable care in determining the amount required to be paid. Moreover, the circumstances here clearly gave rise to a "duty arising [both] out of contract *[and] otherwise"* (to paraphrase *White v. Guarente* ) in two separate respects. One circumstance was that CPI was dependent upon the proposed transaction with ATI to provide funding for payment of the approximately $600,000 which it believed and had represented to ATI and GTE that it owed NYTel, and NYTel concededly knew this. It is self-evident that a gross overstatement of CPI's indebtedness to NYTel would destroy the proposed ATI transaction, which is precisely what happened. The other circumstance is that NYTel is a state-chartered monopoly with which all persons wishing to be in the telephone business in New York must deal. If NYTel terminates your telephone service, there is no place else to go and you are out of business. Given that fact, it is ludicrous to suggest that NYTel did not have a duty to act with care in determining, and representing to ATI, the amount of CPI's indebtedness. This is particularly so where NYTel knew that ATI would act upon its statements on July 20 in determining whether to finance CPI's debt to NYTel.

### Misrepresentation

NYTel next argues that "The Record Evidence Does Not Establish The Existence Of Any Negligent Misrepresentation", asserting that "[i]t is undisputed that the AT & T charges on plaintiff's bills were the AT & T charges that were furnished by AT & T [3] to NYT for inclusion in plaintiff's bills.... NYT's statement that these were the AT & T charges, and NYT's inclusion of these charges in plaintiff's phone bill, did not become misrepresentations because plaintiff disagreed with the AT & T charges" (NYTel's Post–Trial Memorandum 19–20). The argument borders on the disingenuous. The purpose of the July 20 meeting was to discuss and attempt to negotiate payment of CPI's indebtedness *to NYTel.* Since prior to 1988, both orally and in the monthly or periodic credit reports, CPI had frequently and consistently asserted its unalterable position that it rejected and would not pay for any AT & T long-distance charges.[4] NYTel was well aware of CPI's position on the AT & T charges long before July 20, 1989.[5] Counsel's reference to "NYT's statement that

---

**3.** While not germane to the issues here, it does not appear from the record either by evidence or stipulation that the AT & T long-distance charges were furnished by AT & T to NYTel. Rather, it appears that the charges were generated from NYTel's computer database.

**4.** NYTel's argument that it did not have the authority to forgive the AT & T charges is not germane to the issues here. There is no question that NYTel not only had the authority but the obligation to "recourse" all disputed AT & T charges to AT & T, thereby removing the AT & T charges from future billings and eliminating the AT & T charges as an issue between NYTel and CPI. The fact that NYTel negligently or willfully failed to recourse the AT & T charges does not alter its obligation to have done so.

Whether CPI might ultimately have been held liable to AT & T for all or any of these charges is also irrelevant. But the subsequent decision of the Federal Communications Commission in *United Artists Pay Phone Corporation v. New York Telephone Company and American Telephone & Telegraph Company,* 8 F.C.C.R. 5563 (1993), annexed as Exhibit A to the Trustee's Pretrial Memorandum, strongly supports CPI's position that it was not liable, since CPI, like the plaintiff in that case, employed every blocking and screening device available to it to avoid AT & T charges.

**5.** Ms. Feeney's internally inconsistent (*viz.,* Trustee's Post–Trial Reply Memorandum p. 6 ftn. 5) testimony at trial that she personally was not aware that CPI rejected all AT & T charges until the July 20 meeting does nothing to support the credibility of NYTel's position, whether the testimony be believed or disbelieved.

these were the AT & T charges" (NYTel Post–Trial Memorandum 20) is belied by all the witnesses, who testified that the NYTel representatives did *not* reveal that their figures included AT & T charges. Messrs. Coghlin and Karson testified that there was no disclosure that any part of the alleged $3–$6 million indebtedness represented AT & T charges; Mses. Feeney and Quattrone testified that the amount owed by CPI ($1.2 million rounded off according to Ms. Feeney, approximately $1 million according to Ms. Quattrone) constituted local service charges only and did not include AT & T long-distance charges.

In arguing that the Trustee has failed to establish any negligent misrepresentation, in the context of the recourse provisions of the billing and collection agreement with AT & T, NYTel argues that that agreement "specifically provides that it creates no rights in any third party, such as the plaintiff" (NYTel Post–Trial Reply Memorandum 24). The argument misses the point, because the Trustee's position in this case is in no way dependent upon a third-party beneficiary contract theory with regard to the recourse procedures. The July 20 meeting took place under the shadow of NYTel's July 14 notice of termination letter. The Public Service Commission tariff precluded termination for non-payment of the disputed AT & T charges. The sole purpose of the July 20 meeting was to discuss and negotiate payment terms on CPI's debt to NYTel for local service charges, so CPI's telephone service would not be terminated and its business destroyed. The recourse provisions of the AT & T billing and collection contract simply confirmed what the law provided.

The statements made by the NYTel representatives at the July 20 meeting constituted misrepresentations in several respects, regardless of which witnesses one believes. Whether Mses. Feeney and Quattrone repre-

sented CPI's debt to be $3–$6 million, or $1.2 million "rounded off", or "approximately" $1 million, the statements were a misrepresentation because the amount actually owed on account of local service charges was approximately $581,000 in mid-July 1989.

■ But there was a more profound misrepresentation at the July 20 meeting. The NYTel representatives, including the NYTel lawyer, Mr. Lagreca, declared forcefully and unequivocally that CPI's service would be terminated if arrangements were not made within a matter of days for payment in full of $1 million or more. Implicit in this declaration is the representation that NYTel had the legal right and power to terminate service for non-payment of $1 million or more.[6] This representation was false for two separate reasons. First, the Public Service Commission tariffs governing NYTel do not permit NYTel to terminate service to a customer for non-payment of disputed AT & T long-distance charges, and it is certain that the approximately $1 million, $1.2 million rounded off and $3–$6 million figures all included substantial AT & T charges. Second, the Public Service Commission tariffs do not permit termination of service for non-payment of local service charges which are disputed by the customer. NYTel knew that any amount in excess of $581,000 was disputed by CPI. Accordingly, failure to disclose that NYTel did not have the legal right to terminate service rendered NYTel's statement that it would terminate service for non-payment of $1 million (let alone $3–$6 million) a material misrepresentation.

### Justifiable reliance

■ Next, NYTel argues that the Trustee has failed to establish justifiable reliance on the part of CPI. In essence NYTel is making two arguments. The first is based on a narrow definition or construction of the term "rely" or "reliance" which ignores the dictio-

---

6. Our jurisprudence has recognized time and again the theory of implied representation. For example, courts have held that each time a debtor uses a credit card the debtor impliedly represents that he or she has the intention and, some but not all courts hold, the ability to repay the charges incurred. *See In re Carrier*, 181 B.R. 742, 747 (Bankr.S.D.N.Y.1995); *FCC National* *Bank v. Sharp (In re Sharp)*, 144 B.R. 372, 374 (Bankr.S.D.Ohio 1992); *The May Co. v. Chech (In re Chech)*, 96 B.R. 781, 783 (Bankr.N.D.Ohio 1988); *Norwest Bank Des Moines, N.A. Card Services Division v. Stewart (In re Stewart)*, 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988); *In re Buford*, 25 B.R. 477, 481 (Bankr.S.D.N.Y.1982).

nary, common usage and the legal context in which the element of "reliance" derives its meaning. The second argument is that the *Glanzer* line of cases is not applicable here.

Since the dictionary and normal usage recognize a broad range of meaning in the word "reliance"[7], one must examine the purpose of the term in its legal context in order to address NYTel's first argument. Although NYTel uses only the words "rely", "reliance" or their derivatives, it is clear that these terms are used synonymously with the term "believe" or "belief". Thus, NYTel argues, in substance, that CPI did not "rely" on the statements made by the NYTel representatives at the July 20 meeting in the limited sense that it did not believe and was not deceived by those statements; only ATI "relied" on the NYTel's statements in the sense that it believed the statements and was therefore deceived and, NYTel asserts, a claim for negligent misrepresentation cannot be predicated on the reliance of a third party. NYTel's argument conflates the elements of a claim for negligent misrepresentation with those for a claim sounding in ordinary fraud

and deceit, and construes "reliance" narrowly to mean no more than "belief". But a claim for negligent misrepresentation is different from a traditional fraud claim, and neither reason nor authority supports such a narrow interpretation of the element of reliance.

The element of "reliance" provides the causal nexus between the defendant's misrepresentation and the harm suffered by the plaintiff, in both negligent misrepresentation and traditional fraud.[8] Traditionally in a fraud claim the causal nexus generally does require proof that the plaintiff believed and was deceived by the misrepresentation, else plaintiff could not show that he was harmed by the false statement. In such a case, "reliance" would indeed equate to belief and deception. See *Robitzek v. Reliance Intercontinental Corp.*, 7 A.D.2d 407, 409, 183 N.Y.S.2d 870, 872 (1st Dep't 1959) (quoting Prosser, *Law of Torts*, p. 554) ("the party deceived must not only be justified in his belief that the representation is true, but he also must be justified in taking action on that basis"); *accord Lanzi v. Brooks*, 54 A.D.2d

---

**7.** THE OXFORD MODERN ENGLISH DICTIONARY (Oxford Univ. Press, 1992, New York) defines reliance as "1. Trust, confidence and 2. A thing relied upon." THE AMERICAN COLLEGE DICTIONARY (3rd ed.) (Houghton Mifflin Company, Boston 1993) defines rely as "1. To be dependent for support, help or supply 2. To place or have faith or confidence"; and defines reliance as "1. The act of relying or the state of being reliant; 2. The faith, confidence or trust felt by one who relies; dependence and 3. One relied on; a mainstay". RANDOM HOUSE—WEBSTER'S COLLEGE DICTIONARY (Random House, Inc., New York, 1992) defines reliance as "1. Confident or trustful dependence and 2. confident, trustful". It defines rely as "1. to depend confidentially; put trust in ( )". BLACKS LAW DICTIONARY 1291 (6th Ed.1990) defines reliance as "In tort for deceit, it is necessary for plaintiff to prove that he relied on misrepresentation though such misrepresentation need not be the sole or even dominant reason for acting if it was a substantial factor in the plaintiff's decision. For fraud purposes, 'reliance' might be defined as a belief which motivates an act. (Citing *Berry v. Robotka*, 9 Ariz.App. 461, 453 P.2d 972, 979 (Ariz.App.1969).) The test of 'reliance' on misrepresentation in sale of stock as ground for recovery under Securities Exchange Act is whether the misrepresentation is a substantial factor in determining the course of conduct which results in the recipient's loss. Where case involves primarily a failure to disclose, positive

proof of reliance is not a prerequisite for recovery; all that is necessary is that the facts withheld be material in sense that reasonable investor might have considered them important in making of such decision." (Citing *Gordon v. Burr*, 366 F.Supp. 156, 165 (S.D.N.Y.1973).)

**8.** The New York Court of Appeals spoke recently about this issue in deciding a case involving "negligent words or acts that induce reliance." *Heard v. City of New York*, 82 N.Y.2d 66, 71, 603 N.Y.S.2d 414, 417, 623 N.E.2d 541, 544 (1993). The Court explained that "this case, like others involving reliance, may be analyzed as raising either an issue of proximate cause or scope of duty." *Id.* at footnote *. The Court illustrated "proximate cause" as being a question of "whether defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing." *Id.* (citing *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 522, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980)). Alternatively, in its duty analysis, the Court counseled that liability may be found "when one party seeks specific information from a second party, and the second party exclusively controls the information and purports to investigate the matter before responding." *Id.*, 82 N.Y.2d at 74, 603 N.Y.S.2d at 418, 623 N.E.2d at 545 (citing *International Prods. Co.*, 244 N.Y. at 339, 155 N.E. at 662). Under either method of analysis, NYTel is liable to CPI for negligent misrepresentation.

1057, 1058–1059, 388 N.Y.S.2d 946, 948 (3rd Dep't 1976); *Burke v. Owen*, 168 A.D.2d 722, 723, 563 N.Y.S.2d 869, 870 (3rd Dep't 1990) (holding that "fraudulent and/or negligent misrepresentation" was not met because the "plaintiff did not credit any representations on the part of the defendant . . ."); 60 N.Y.Jur.2d, *Fraud and Deceit*, § 135. In this case, however, the circumstances were such that CPI was harmed by the NYTel misrepresentations even if it did not itself believe that its indebtedness was either $1 million or $3–$6 million, or that NYTel's declared intention to terminate service within a few days was lawful.[9] Although CPI itself was only partly deceived in the narrow sense of "reliance", it was unquestionably harmed by NYTel's false statements because those statements were made to ATI in such circumstances that the proposed transaction with ATI was destroyed. There can be no doubt that CPI "relied" on NYTel in the sense that (i) it was dependent upon NYTel to fairly and accurately inform ATI of the amount of the CPI indebtedness and the circumstances under which NYTel could lawfully terminate service to CPI, (ii) its continuing viability was dependent upon the proposed transaction with and financing from ATI and (iii) the actions taken by CPI, ATI and GTE were a direct, proximate and foreseeable consequence of the misrepresentations made by NYTel at the July 20 meeting. Because of (*i.e.*, in reliance upon) the NYTel statements on July 20, ATI and GTE repudiated the proposed merger and the memorandum of intent, and CPI was compelled to file a petition under Chapter 11.

■ Now let us examine NYTel's second argument asserting the inapplicability of the *Glanzer* line of cases. In order to understand the significance of *Glanzer* and its progeny, it is important to identify the primary relationship between the parties involved that gives rise to a duty by the defendant to speak with care. In all the cases, including this one, that duty sprang from a primary contractual relationship. In this case the contractual relationship was between NYTel and CPI, and CPI was the party to whom NYTel owed a primary duty to speak with care. In the *Glanzer* line of cases [10], the primary contractual relationship was between two directly contracting parties, although in all those cases, save one [11], a third party (the plaintiff) was both deceived and induced thereby to take action which resulted in harm to it, the third party. In this case, the third party (ATI) was deceived and induced to take action, but that action foreseeably resulted in harm to CPI, the primary party to whom NYTel owed a duty to speak with care. Thus, the rule of law embodied in the *Glanzer* line of cases applies *a fortiori* in this case, where the foreseeable harm resulting from a misrepresentation addressed to a third party fell upon the contracting party to whom the defendant owed a primary duty to speak with care.

The *Zampatori* case referred to in footnote 11, above, presents yet another variation of fact. In that case the plaintiff (an employee) sued the defendant (a detective agency) for making misrepresentations to a third party (the employee's employer) in circumstances where it was foreseeable that the third party employer would "rely" on the detective agency's submission to the detriment of the plaintiff-employee. Specifically, it was alleged that the employee was fired as a consequence of the detective agency's misrepresentations to the employer. Obviously the plaintiff-employee did not "rely" on the misrepresentations in the very narrow sense

9. In fact, CPI doubtless *was* deceived in the sense that its officers almost certainly did not know that NYTel's termination threats were unlawful, particularly since the threats were reinforced by the presence and statements at the July 20 meeting of NYTel's regulatory attorney, Labreca. But in the circumstances of this case it can readily be seen that whether or not CPI believed and was deceived is immaterial, because it could not deflect the consequence of NYTel's misrepresentations in any event. The harm suffered by CPI resulted not from the fact that it was deceived but because ATI was moved to action by NYTel's statements.

10. *See Glanzer v. Shepard, supra; Ossining School District v. Anderson LaRocca Anderson, supra; Credit Alliance Corp. v. Arthur Andersen & Co., supra; International Products Co. v. Erie R.R. Co., supra; White v. Guarente, supra.*

11. *Zampatori v. United Parcel Serv.*, 125 Misc.2d 405, 479 N.Y.S.2d 470 (Sup.Ct. Monroe Co. 1984), *infra.*

that NYTel now argues. But the New York court sustained the cause of action because the misrepresentation induced conduct by a third party acting in "reliance" which directly and foreseeably resulted in harm to the plaintiff-employee. Once again, the rule of law embodied in the *Zampatori* case applies *a fortiori* in this case because, unlike the plaintiff in *Zampatori*, CPI was the primary party to whom NYTel owed a duty of care by reason of the parties' contractual relationship.

The cases cited by NYTel purporting to require reliance by the plaintiff involve very different facts and claims from the case at hand. *Shaw v. Rolex Watch, U.S.A.*, 673 F.Supp. 674, 681 (S.D.N.Y.1987) deals with state law claims of fraud, conversion and intentional infliction of emotional distress but no claim of negligent misrepresentation. *Orlin v. Torf*, 126 A.D.2d 252, 254, 513 N.Y.S.2d 870 (3d Dep't), *leave to appeal denied*, 70 N.Y.2d 605, 519 N.Y.S.2d 1029, 513 N.E.2d 1309 (1987) concerns a claim for fraud not for negligent misrepresentation. *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir.1984) concerns a claim by ratepayers against LILCO that the utility made improper representations to the Public Service Commission in seeking rate increases, which is quite different from a claim concerning information relayed by a utility at a meeting in which the complaining customer was participating.

Were ATI, GTE and CPI "justified" in so conducting themselves in "reliance" on NYTel's statements? The question answers itself. It would be surprising indeed if ATI, believing CPI's debt to be less than $600,000, would proceed with the proposed merger after being told forcefully by NYTel that the debt was really $1 million, or $1.2 million, or $3–$6 million and that CPI's service would be terminated if the debt were not paid within a few days. And CPI obviously had no alternative but to file for bankruptcy to protect its business from certain destruction.

Neither equity nor the law is served by putting the term "reliance" in a definitional straightjacket not called for by the dictionary, common parlance or the common sense meaning of the word in its legal context. In the factual circumstances of this case, I conclude as a matter of fact and law that the causal nexus between NYTel's July 20 misrepresentations and CPI's injury has been established, and the Trustee has sustained her burden of proof on the element of reliance.

### Damages

Finally, NYTel argues that New York follows an "out-of-pocket rule" of damages for misrepresentation and that the measure of damages for misrepresentation is "the actual pecuniary loss sustained as a direct result of the wrong", citing *Corcoran v. O'Brien*, 21 A.D.2d 838, 250 N.Y.S.2d 117 (3d Dep't 1964), *Sager v. Friedman*, 270 N.Y. 472, 1 N.E.2d 971 (1936), *reh'g denied*, 271 N.Y. 617, 3 N.E.2d 212 (1936) and *AFA Protective Systems Inc. v. American Telephone & Telegraph Company*, 57 N.Y.2d 912, 456 N.Y.S.2d 757, 442 N.E.2d 1268 (1982).

■ The question of damages will be examined in full below. Suffice it here to state that a necessary element to establish a cause of action for negligent misrepresentation is the element of damage or injury proximately caused by the false representation. *International Products Co. v. Erie R. Co.*, 244 N.Y. at 337–38, 155 N.E. at 663–64; *Pappas v. Harrow Stores, Inc.*, 140 A.D.2d 501, 503, 528 N.Y.S.2d 404, 406 (2d Dep't 1988); *Raymond Corporation et al. v. Coopers & Lybrand*, 105 A.D.2d 926, 482 N.Y.S.2d 377, 379 (3d Dep't 1984) (damage is a necessary element for a cause of action for negligent misrepresentation); *Kermisch v. Avis Rent a Car Systems, Inc.*, 71 A.D.2d 790, 791, 419 N.Y.S.2d 793, 795–96 (4th Dep't 1979) (court held a sufficient cause of action was pleaded for negligent misrepresentation where complaint included compensatory and punitive damages). "Proximate cause is more than 'but for' causation. Thus in addition to showing that but for defendant's alleged misrepresentations plaintiff would not have suffered his asserted damages, plaintiffs must also show that the misstatements were the reason plaintiffs suffered these damages." *Johnson v. Chesebrough–Pond's USA Co.*, 918 F.Supp. 543, 549 (D.Conn.1996); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89–90 (2d Cir.1994) ("requisite causation is established only where the loss

complained of is a direct result of the defendant's wrongful actions independent of other causes").

The Trustee has sustained her burden of proof with regard to the element of damage. Prior to the July 20 meeting CPI was a going concern albeit in arrears on its debts, one of the largest independent COCOT operators in the New York metropolitan area, with a memorandum of intent dedicated to resolving its operational and financial difficulties with GTE, its largest creditor and a major factor in the COCOT business, and an agreement in principle to merge with ATI which would provide the usual management and operations economies, a significantly larger presence in the market and a cash infusion of up to $1,600,000 with which to retire its debt to NYTel of approximately $600,000. Immediately after, and as a consequence of, the July 20 meeting, CPI had lost its agreements with ATI and GTE and its business and assets faced certain destruction within a few days. CPI's business was literally destroyed by the events at the July 20 meeting. Although CPI forestalled the termination of service by filing under Chapter 11 on July 21, which enabled it to continue in business as a debtor-in-possession for some months thereafter, the financial/business entity which was CPI pre-petition ceased to exist as a consequence of the July 20 meeting. Accordingly, the Trustee has sustained its burden of establishing economic injury proximately caused by NYTel's misrepresentations.

### Conclusion

Based upon all of the evidence, the Court makes the following findings of fact and conclusions of law with respect to the Trustee's claim for negligent misrepresentation.

1.  NYTel's statements at the July 20 meeting that CPI's debt of approximately $1 million, or $1.2 million rounded off, or $3–$6 million were materially false, in that the actual amount of the indebtedness was approximately $581,000. NYTel's statements that it would terminate all service to CPI within a matter of days for non-payment of the indebtedness just referred to constituted a material misrepresentation in that the statements impliedly and falsely represented that NYTel had the right to terminate service for such non-payment and there was no disclosure that NYTel could not lawfully terminate service under the governing Public Service Commission tariffs.

2.  The NYTel representatives at the July 20 meeting knew that ATI proposed to enter into a transaction with CPI under which ATI would provide financing to pay off CPI's indebtedness to NYTel, that the purpose of the July 20 meeting was to inform ATI and CPI of the amount required to be paid and that ATI could reasonably be expected to act in reliance upon the statements made by NYTel.

3.  CPI suffered economic harm as a consequence of NYTel's misrepresentations.

4.  CPI perforce relied upon, and was dependent upon, NYTel to act with care in making statements to ATI regarding CPI's indebtedness and NYTel's legal rights against CPI in the event of non-payment.

5.  The relationship between NYTel and CPI, arising out of contract and otherwise, was such that NYTel had a duty to act with care in making statements to ATI regarding CPI's indebtedness and NYTel's legal rights under the governing Public Service Commission tariffs in the event of non-payment. NYTel breached that duty.

Accordingly, the Trustee has sustained her burden of proof with respect to all of the elements necessary to sustain a claim of liability for negligent misrepresentation.

## II.  Tortious Interference with Economic Opportunity

The Court of Appeals for the Second Circuit has articulated the elements for a claim of tortious interference with economic opportunity as follows: plaintiff must show "the defendant's interference with business relations existing between plaintiff and a third party, either with the sole purpose of harming the plaintiff, or by means that are dishonest, unfair, or in any other way im-

proper." *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 269 (2d Cir.1987). NYTel does not disagree with the Second Circuit's delineation of the elements of tortious interference in *PPX Enterprises* but, surprisingly, complains of the Trustee's quotation of this sentence without quoting the very next sentence in the *PPX Enterprises* decision, which reads: "If the defendant's interference is intended, at least in part, to advance its own competing interest, the claim will fail unless the means employed include criminal or fraudulent conduct." Counsel has made · unambiguously clear in NYTel's Post–Trial Memorandum and Post–Trial Reply Memorandum that NYTel's conduct, which the Trustee alleges constituted "interference", was indeed "intended, at least in part, to advance its own competing interest", thereby invoking the more stringent standard of "criminal or fraudulent conduct".

■ As noted above, under the doctrine of *Erie v. Tompkins* the federal courts must look to the elements of a state law claim as articulated by the state courts. Under New York law, to prevail on a cause of action seeking damages for tortious interference with economic opportunity, a plaintiff must prove that the alleged means employed by a competitor to damage its economic opportunity with a third party somehow restrained trade or were wrongful. *Guard–Life Corporation v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). " 'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Id.* at 190–91, 428 N.Y.S.2d 628, 406 N.E.2d 445. ("Although his status as a competitor does not protect the interferer from the consequences of his interference with an existing contract, it may excuse him from the consequences of interference with prospective contractual relationships, where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful"); *Union Car Advertising Co., Inc. v. Collier,* 263 N.Y. 386, 400, 189 N.E. 463 (1934) ("To entitle the plaintiff to recover in an action like this it must prove that it would have procured and received the contract but for the wrongful and illegal interference of the defendants"); *Fine v. Dudley D. Doernberg & Co., Inc.,* 203 A.D.2d 419, 419, 610 N.Y.S.2d 566 (2d Dep't 1994) ("in order to successfully oppose the defendants' motion for summary judgment, the plaintiff was required to offer proof in admissible form that '[she] would have received a contract but for the malicious, fraudulent and deceitful acts of [the defendants]' ") (citations omitted); *Jurlique, Inc. v. Austral Biolab Pty., Ltd.,* 187 A.D.2d 637, 639, 590 N.Y.S.2d 235 (2d Dep't 1992) ("In order to demonstrate interference with future contracts or contracts terminable at will, a showing of 'wrongful' conduct, defined as fraudulent representations, threats, or a violation of a duty of fidelity owed to the plaintiff by reason of a confidential relationship between the parties, is required") (citations omitted); *Fantaco Enterprises, Inc. v. Iavarone,* 161 A.D.2d 875, 877, 555 N.Y.S.2d 921 (3d Dep't 1990) ("To succeed on a cause of action for tortious interference with prospective business relations or advantage, a plaintiff must show that a competing defendant used unlawful means or that the defendant's sole motive was to injure the plaintiff"); *Rad Advertising, Inc. v. United Footwear Organization, Inc.,* 154 A.D.2d 309, 309–10, 546 N.Y.S.2d 597 (1st Dep't 1989) ("intentional interference with a pre-contractual business relationship is actionable if effected by unlawful means or, under the theory of prima facie tort, by lawful means without justification ... use by defendants of unlawful or wrongful means [ ] which consist only of culpable conduct on the part of the interferor, such as physical violence, fraud, etc."); *Coan v. Estate of Harry Chapin,* 156 A.D.2d 318, 319, 549 N.Y.S.2d 16 (1st Dep't 1989) ("Wrongful means may include civil suits and some degrees of economic pressure"); *Yan's Video, Inc. v. Hong Kong TV Video Programs, Inc.,* 133 A.D.2d 575, 579, 520 N.Y.S.2d 143 (1st Dep't 1987) (" 'Wrongful means' include physical violence, fraud or misrepresentation, civil suits

and criminal prosecutions, and some degrees of economic pressure; they do not however, include persuasion alone although it is knowingly directed at interference with the contract"); *Koeppel v. Schroder*, 122 A.D.2d 780, 782, 505 N.Y.S.2d 666 (2d Dep't 1986) ("In order to sustain a cause of action based on tortious interference with a contract terminable at will there must be a showing of wrongful interference such as fraudulent representations or threats"); *Noah v. L. Daitch & Co., Inc.*, 22 Misc.2d 649, 653, 192 N.Y.S.2d 380 (Sup.Ct.1959) ("mere inducement to discontinue such relationship is not actionable 'unless the purpose of the actor was solely to produce damage, or unless the means employed were dishonest or unfair' ") (citing *Coleman & Morris v. Pisciotta*, 279 App.Div. 656, 107 N.Y.S.2d 715, 716 (2d Dept.1951)).

Thus, to establish a claim for tortious interference with economic opportunity, the Trustee must prove the following elements:

(1) that business relations existed between CPI and a third party, namely ATI,

(2) that NYTel interfered with that business relationship and,

since NYTel's conduct was intended, at least in part, to advance its own competing interests in the coin-operated telephone business,

(3) that "restraint of trade [was] effected" by the interference, or that " '[w]rongful means' [were employed] includ[ing]

12. One cannot fail to be struck by the anomaly of asserting that NYTel was merely "try[ing] to collect" an overdue sum by grossly overstating the sum due, in the presence of the third party who was expected (but not obligated) to pay it, and threatening to terminate service in a matter of days for non-payment, with knowledge that the overdue sum would not be collectible without funding from the third party. Such conduct appears more designed to frustrate than to foster collection, and so indeed it turned out.

13. 16 N.Y.C.R.R. 631.9 states in pertinent part:
(a) ... Regardless of whether a notice of discontinuance has previously been sent, the utility's procedures shall provide that, pending the utility's investigation, it shall not discontinue service or issue a notice of discontinuance, provided, however, a consumer may be required to pay the undisputed portion of a disputed bill or deposit to prevent discontinuance or the issuance of a notice of discontinuance.
(b) If, after the completion of such an investigation, the utility determines that the disput-

physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure ..." (*Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445).

### NYTel's contentions

NYTel argues first that "there can be no contention that NYT acted for the sole purpose of harming the plaintiff, because NYT had every right to try to collect the substantial overdue sums plaintiff owed it" (NYTel Post–Trial Memorandum 26–27).[12] NYTel undoubtedly had the right to try to collect the sum due from CPI for local service charges, but it did not have the right to demand amounts greatly in excess of the amount owed to it, or to employ wrongful methods to collect any amount. By any measure NYTel's conduct meets the standards articulated in *Guard–Life* and other New York cases and summarized above, including:

- the material misrepresentations made by NYTel at the July 20 meeting;
- violation of 16 N.Y.R.R. Part 631.31(ii) which requires written notice of termination stating "the total amount required to be paid by the subscriber ...";
- violation of both the New York State regulation [13] and the Public Service Commission tariff [14] prohibiting termination

ed service has been rendered, or that the disputed charge or deposit is proper, in whole or in part, the utility may require the full bill or deposit or the appropriate portion thereof to be paid; in such event, appropriate notice of the determination shall be given to the customer, and where notice of discontinuance of service has previously been sent, or is served with the determination, such notice shall include a statement advising the customer of the availability of the commission's complaint handling procedures....
16 N.Y.C.R.R. 631.9.

14. P.S.C. No. 900, Section H(11) provides in relevant part:

Telephone service shall not be suspended or terminated for nonpayment of any billed charge which is in dispute or for the nonpayment of a deposit which is in dispute during the period before a determination of the dispute is made by the Company in accordance with Company complaint handling procedures.

of telephone service for non-payment of disputed NYTel charges;

- violation of the regulation and tariff prohibiting termination of local telephone service for a customer's failure to pay disputed long-distance telephone charges, including AT & T charges;

- NYTel's trade libel in falsely reporting the amount of CPI's indebtedness at the July 20 meeting (*see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) [15]);

- NYTel's near extortionate "economic pressure" effecting a "restraint of trade" in making excessive demands for payment backed by unlawful threats of interruption of service at the July 20 meeting with the foreseeable effect of eliminating a competitor (*see Italian & French Wine Co. v. Negociants U.S.A., Inc.*, 842 F.Supp. 693, 701–02 (W.D.N.Y. 1993)) (wine distributor's threat to terminate its relationship with a wine supplier unless the supplier permitted it to expand into another distributor's exclusive area constituted "some degree of economic pressure"); *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 946 (S.D.N.Y.1983) ("[i]t is beyond dispute that a conspiracy to unreasonably restrain trade or to monopolize trade would constitute improper means");

- violation of the automatic stay by terminating service post-petition on the 109 lines which CPI had attempted to have transferred to ATI pre-petition.

These procedures are in accordance with the Public Service Rule contained in Subchapter C, Chapter VI, Title 16 of the New York Code of Rules and Regulations, Part 6731—Notice of Discontinuance and Complaint Procedures, Section 631.9 and 631.10, and the Company may not discontinue service regarding a disputed bill or deposit until it has complied with said Commission Rules.

Telephone service may be suspended or terminated for nonpayment of the undisputed portion of a disputed bill or deposit if the subscriber, having been asked to pay such undisputed portion, does not do so . . .

P.S.C. No. 900, Section H(11) (Effective November 21, 1984).

Second, NYTel asserts that "[i]t is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are", quoting from *Thur v. IPCO Corp.*, 173 A.D.2d 344, 345, 569 N.Y.S.2d 713, 715 (1st Dep't 1991), *appeal dismissed,* 78 N.Y.2d 1007, 575 N.Y.S.2d 457, 580 N.E.2d 1060 (1991) and *Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314 (2d Cir.1950). In the context of this case, the *Thur v. IPCO Corp.* defense of good faith is unavailing for several reasons. First, if NYTel wished to argue that its employees Feeney, Quattrone and Lagreca acted in good faith by making the termination threats on July 20 because they honestly did not know of the New York State regulations and P.S.C. tariffs which their threats violated, it was incumbent on NYTel to elicit testimony from each witness demonstrating his or her ignorance of the law which governed their conduct. They made no effort to do this. Thus, there is no factual predicate for the good faith defense. Second, even if all three witnesses had testified that they acted in good faith out of ignorance of the governing tariffs, this would not insulate *NYTel* as a matter of law. It is simply not acceptable as a legal proposition that a utility, acting through the officials which *it* designated to discharge *its* legal duties to *its* customers, can violate Public Service Commission tariffs, which NYTel concedes have the force of law in New York [16], by pleading that those officials were ignorant of the tariffs. Finally, even if the *Thur v. IPCO* good faith defense were otherwise applicable as a matter of fact

15. In *Dun & Bradstreet,* the defendant issued a false report concerning plaintiff's financial condition and a third-party relied on this information in declining to provide financing to the plaintiff. Under these circumstances, the Court held that the claim for trade libel was actionable.

16. The tariffs of a public utility are binding with the force of law upon both the utility and its customers. *See, e.g., Leitner v. New York Telephone Company*, 277 N.Y. 180, 189, 13 N.E.2d 763, 767 (1938), *reh'g denied,* 278 N.Y. 598, 16 N.E.2d 118 (1938); *Purcell v. New York Central R.R.*, 268 N.Y. 164, 171–72, 197 N.E. 182, 184, *appeal dismissed,* 296 U.S. 545, 56 S.Ct. 173, 80 L.Ed. 387 (1935).

and law, the conduct in question was sufficiently wrongful to meet the most stringent standard for a tortious interference claim, as shown above.

Moreover, NYTel's reliance on *Thur* and *Kaplan* is misplaced because both are clearly distinguishable from the case at hand. In *Thur* the plaintiff was a party to agreements which contained restrictive covenants prohibiting him from engaging in competitive employment for three years. One month after leaving the defendant's employ the plaintiff entered into an employment contract with a competitor. The defendant objected and caused letters to be sent threatening legal action should plaintiff's employment not be terminated. In *Kaplan* a toy and novelty manufacturer brought a suit to declare a patent invalid and for unfair competition. Prior to the suit the defendants sent letters and notices to the plaintiff and some of its customers threatening legal action for patent infringement, but did not bring suit. The Court found that where the only evidence of bad faith was "defendants' failure to sue promptly," *id.* at 314, the presumption that a patent is valid could not be overcome. Good faith reliance upon a presumptively lawful covenant not to compete and a presumptively valid patent are in no way analogous to NYTel's misrepresentations and unquestionably unlawful threats.

Next, NYTel argues that the Trustee has failed to show that CPI and ATI would have entered into a definitive merger agreement but for the tortious interference (NYTel Post–Trial Memorandum 29). In support, NYTel points out that the July 12 letter from ATI to CPI and the July 20 memorandum of intent between ATI, CPI and GTE were not enforceable contracts but were subject to definitive agreements without a binding commitment on the parties. Of course, if those documents constituted binding contracts the cause of action in this proceeding would have been for tortious interference with contract. Every claim for tortious interference with economic opportunity entails some business relationship which did not come to fruition in a binding contract precisely because of the defendant's wrongful conduct. Indeed, most such claims are not supported by such compelling evidence of the parties' intent to proceed to contract as the July 12 letter from ATI and the July 20 memorandum of intent, fully substantiated by the unequivocal testimony of the senior ATI officials, Messrs. Coghlin and Stern. Both testified that ATI would have proceeded with the CPI merger if the NYTel representatives had not stated on July 20 that CPI owed between $3–$6 million and that service would be terminated in a few days if the bill were not paid. In this case there is no evidence in the record which raises any doubt whatever that CPI, ATI and GTE would have proceeded with definitive agreements to memorialize the July 12 and July 20 letter and memorandum.

Finally, NYTel argues that this cause of action cannot be sustained under the rubric that "damages cannot be remote, contingent or speculative" (NYTel Post–Trial Memorandum at 30). Again, the subject of damages is discussed below. Suffice it here to state that the fact that CPI sustained economic injury as a consequence of NYTel's conduct in the July 20 meeting is absolutely clear and certain—the fact of damage is in no sense remote, contingent or speculative.

### Conclusion

The Court makes the following findings of fact and conclusions of law with respect to the Trustee's claim based on tortious interference with economic opportunity.

1. Prior to the July 20 meeting CPI had business relations with ATI and GTE as reflected in the July 12 letter from ATI and the July 20 memorandum of intent. There is no evidence in the record suggesting that the parties to those documents would not have proceeded with the business relationships referred to therein but for the events at the July 20 meeting.

2. With knowledge that CPI and ATI were contemplating entering into an agreement under which ATI would provide the funding necessary to pay CPI's indebtedness to NYTel, NYTel interfered with the business relations between ATI and CPI by making misrepresentations at the July 20 meeting as previously described.

3. NYTel interfered with CPI's business relations with ATI by means which were unfair, improper and unlawful, including misrepresentations, threats, improper economic pressure, restraint of trade and multiple violations of the Public Service Commission tariffs which governed its conduct.

4. CPI sustained economic injury as a consequence of NYTel's interference.

Accordingly, the Trustee has sustained her burden of establishing the requisite elements of liability for tortious interference with economic opportunity.

### III. *Breach of the Covenant of Good Faith and Fair Dealing*

■■■ The Trustee argues that NYTel breached the "implied covenant of good faith and fair dealing" ("covenant") (Post–Trial Memo at 59–60). Specifically, it is claimed that NYTel did not

1) ... properly institute the requested screening and blocking procedures; 2) ... keep accurate records regarding amounts owed for NYTel's local telephone charges; 3) ... keep accurate records regarding amounts owed for NYTel's local telephone charges; and 4) ... refrain from wrongfully demanding payments in dispute in violation of New York State regulations and NYTel tariffs.

(*Id.* at 61). Thus, CPI alleges that NYTel acted "in bad faith and engaged in commercially unreasonable conduct" (*id.*).

NYTel responds that implying the covenant is an illegal revision of the contract, since "the tariffs of a public utility are not mere contracts, but are binding with the force of law upon both the utility and its consumers" (NYTel Post–Trial Memo at 32–33). Additionally (or alternatively), it argues that CPI breached the $10,000 per week "payment arrangement" and that NYTel acted reasonably (NYTel Post–Trial Reply Memo at 37–38).

■■■ This Court finds that an implied covenant existed and was breached by NYTel. "Every contract contains an implied covenant of good faith and fair dealing." *O'Shanter Resources, Inc. v. Niagara Mo-*

*hawk Power Corp.*, 915 F.Supp. 560, 568 (W.D.N.Y.1996) (citing *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917)); *see also Discon Incorp. v. NYNEX Corp.,* 1992 WL 193683 at *15 (W.D.N.Y. 1992) (covenant existed in a "purported contract" between Discon, a baby-Bell, and NYTel); *Van Valkenburgh, Nooger & Neville v. Hayden Pub. Co.,* 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142 *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Havel v. Kelsey–Hayes Co.,* 83 A.D.2d 380, 382, 445 N.Y.S.2d 333 (4th Dep't 1981). "[T]he undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Havel,* 83 A.D.2d at 382, 445 N.Y.S.2d at 335 (quoting 11 *Williston on Contracts* [3d ed.], § 1295, p. 37). A plaintiff claiming a breach must show "1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence." *Smith Barney, Harris Upham & Co. Inc. v. Liechtensteinische Landesbank,* 1993 WL 97286 at *5 (S.D.N.Y.1993) (quoting *T.P.K. Constr. Corp. v. Southern American Ins. Co.,* 752 F.Supp. 105, 112 (S.D.N.Y. 1990)) (citing *Kalisch–Jarcho, Inc. v. City of New York,* 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983)).

The Court has no hesitation finding a breach. Contrary to NYTel's assertion, the Court fails to see how such a covenant constitutes a revision of the contract or the tariffs. The cases cited by NYTel in support of this assertion do state that a covenant cannot be implied "inconsistent with the terms expressly set forth in the contract", *Hartford Fire Ins. v. Federated Dep't Stores,* 723 F.Supp. 976, 991 (S.D.N.Y.1989), but those cited purporting to support the notion that a covenant is inconsistent with the "payment arrangement", because it is more than a "mere contract", offer no such foundation. (*See* NYTel Post–Trial Memo at 33 (citing *Leitner v. New York Tel. Co.,* 277 N.Y. 180, 189, 13 N.E.2d 763, 767 (1938)) ("As to whether rules of a public utility duly promulgated were by it so applied is open for decision in the courts, but the question of reasonableness of the rule

can be attacked only before the Public Service Commission."); *Purcell v. New York Central R.R.*, 268 N.Y. 164, 171–72, 197 N.E. 182, 184, *cert. denied*, 296 U.S. 545, 56 S.Ct. 173, 80 L.Ed. 387 (1935) ("The statute [dealing with railroad rates] makes the specified rate as fixed uniform and lawful until changed by or with the permission of the commission.")).

NYTel argues that "courts generally have been reluctant to find a breach of a [covenant] when doing so reads so much into the contract as to create a new term or when the contract expressly grants a party the right to take actions that otherwise may be considered a breach [of the covenant.]" · *Keene Corp. v. Bogan*, 1990 WL 1864 at *14 (S.D.N.Y.1990). Nothing in the tariffs conflicts with the covenant of good faith and fair dealing. Relevant New York State law incorporates the covenant by repeatedly using terms like "just and reasonable". *See, e.g.*, N.Y.Pub.Serv.Law § 91(1) (McKinney 1989) ("All charges made or demanded by any ... telephone corporation ... shall be just and reasonable ..."); N.Y.Pub.Serv.Law § 97 (McKinney 1989) ("Whenever the [Public Service Commission] shall be of the opinion ... that the rules, regulations or practices of any ... telephone company are unjust or unreasonable ...") (McKinney 1989).

Indeed, New York courts have held a public utility's duty *higher* than that of the average party to a contract. NYTel's "good faith must be subjected to particular scrutiny because [its customer's] obligation to enter into the contract [ ] was not voluntarily assumed but imposed by law." *O'Shanter*, 915 F.Supp. at 568 (quoting *Philadelphia Corp. v. Niagara Mohawk Power Corp.*, 207 A.D.2d 176, 178, 621 N.Y.S.2d 237, 239 (3d Dep't 1995)).

Thus, based on the Court's prior findings and the above authorities, I conclude that a covenant of good faith and fair dealing existed and was breached by NYTel. NYTel simply did not act in commercial "good faith" or "reasonably" in its dealings with CPI.

## IV. *Limitation of Liability Provision in NYTel's Tariffs*

NYTel asserts that the Trustee has failed to overcome the limitation of liability provision contained in the governing Public Service Commission tariffs, which state that NYTel's liability for "errors, mistakes, omissions, interruptions, or delays of the Telephone Company ... in the course of establishing, furnishing, rearranging, moving, terminating, or changing the service and facilities" is limited to conduct constituting "gross negligence or willful misconduct". This Court has no difficulty in concluding that NYTel's conduct in this case meets the standard of "gross negligence or willful misconduct".

■ *Misrepresentation of the CPI indebtedness.* In assessing the gravity of NYTel's conduct in the July 20 meeting, it is important to bear in mind the purpose and context in which the factual misrepresentations were made. The July 14 letter was a notice of termination of service for non-payment of CPI's debt to NYTel. The letter itself contains language calling attention to the serious purport of the message—termination of service for non-payment of the "full amount" due. The responsible NYTel officials knew in advance that the purpose of the July 20 meeting was to discuss CPI's indebtedness in the presence of a third party with which CPI was planning a transaction which would provide funding for full payment of CPI's debt to avoid termination of service. The responsible NYTel officials including Ms. Quattrone if not Ms. Feeney (*cf.* footnote 5, above) had known since at least May 1989 that CPI rejected *all* AT & T long-distance charges which, therefore, had to be recoursed to AT & T and eliminated from NYTel's bills to CPI consistent with the Public Service Commission tariffs which forbade NYTel to terminate service for non-payment of AT & T charges. Thus, the AT & T charges were irrelevant to and should have played no part in the July 20 meeting. Nevertheless, at the July 20 meeting Ms. Feeney and Ms. Quattrone asserted that the amount "owed by CPI was between $3,000,000 to $6,000,000" (Undisputed Facts ¶ 19 of the Pretrial Order). Even if one were to disregard and disbelieve the parties' stipulation of fact, the documentary evidence (GTE's letter dated July 21) and the testimony at trial and

in deposition of the ATI and CPI witnesses (Messrs. Coghlin, Stern and Karson) and instead credit the inconsistent testimony of the NYTel witnesses that they represented the NYTel debt to be $1.2 million "rounded off" (Ms. Feeney), or "approximately $1 million" (Ms. Quattrone), the misrepresentation was nonetheless outrageous because the NYTel figure (whatever it was) overstated CPI's debt to NYTel by including hundreds of thousands of dollars of AT & T charges. Under the circumstances, the NYTel misrepresentation constituted either gross negligence or willful misconduct.

*Unlawful threats of termination.* NYTel's gross overstatement of the CPI indebtedness might have been capable of amicable resolution by the simple expedient of a detailed joint review of all of the CPI accounts had it not been for the unambiguous declarations by the NYTel representatives at the July 20 meeting that service would be cut off on the date specified in the July 14 letter, namely July 24, if "full payment" were not made on the debt, whatever it was. As made clear in the testimony of both Ms. Feeney and Ms. Quattrone, this was no mere threat or bargaining ploy—it was an unambiguous statement, and the NYTel representatives meant what they said and intended that ATI and CPI believe it, which they did. These statements violated the Public Service Commission tariffs governing NYTel in three separate respects: (i) as a condition of termination, the tariff required NYTel to specify in writing the precise amount owed; (ii) the tariff did not permit NYTel to interrupt or terminate service for non-payment of AT & T charges; (iii) the tariff did not permit NYTel to interrupt or terminate service for nonpayment of NYTel service charges which were in dispute. No subtleties were presented by any of these three violations and none presented a close question: the NYTel representatives *knew* that they had not prepared a precise written calculation of the amount due and that CPI disputed any amount over $581,000, and the NYTel computer record for each account would have demonstrated the portion of the account comprising unpaid AT & T charges. The three violations and consequent misrepresentation were compounded by both the presence and affirmative statements at the July 20 meeting of NYTel's own regulatory attorney, Lagreca. It is difficult to imagine a more persuasive demonstration of gross negligence or willful misconduct.

■ *Post-petition AT & T charges.* The Court has already made findings (i) that effective subsequent to July 21, 1989 CPI did everything in its power to request, and NYTel was required to implement, all of the available blocking and screening services including PIC–NONE, OCS, BNS and 10XXX, and (ii) that improper or fraudulent AT & T long-distance charges would have been significantly reduced or virtually eliminated if these screening and blocking procedures had been implemented by NYTel and were operating properly. Despite these facts, NYTel billed CPI approximately $234,000 in AT & T charges during the relatively brief post-petition period. It appears from the evidence that the enormous and costly task of monitoring the thousands of individual monthly billing statements for the CPI accounts in order to identify and correct these billing errors was the principal cause of CPI's failure in the post-petition period. If the incidence of improper billing of AT & T charges had not surfaced as a problem until some time in the post-petition period, or if the evidence (as opposed to unsubstantiated arguments of counsel) showed that the technology was of such frailty that improper AT & T charges could be billed despite reasonable care on the part of NYTel, one might conclude that the remarkably high volume of post-petition AT & T charges was attributable to mere negligence. But such was not the evidence. NYTel was able to assure its own coin-operated telephone customers that they would never experience unauthorized long-distance charges. Improper AT & T charges had been a major problem and the major bone of contention, both verbal and in writing, between CPI and NYTel since late 1987. The only technological lacuna in the blocking and screening services which would not have been cured by the implementation of 10XXX was the potential for area code "809" calls emanating from the Caribbean, but NYTel presented no evidence showing that a large percentage or any of the post-petition AT & T charges were area code

214

"809" calls. Under the circumstances, the Court finds that the post-petition failure to implement or properly operate the blocking and screening services and the other billing problems including multiple account billing constituted gross negligence or willful misconduct.

**Violation of the automatic stay.** At the July 20 meeting, following the $3–$6 million statements and termination threats and the consequent bedlam and departure from the meeting of CPI's Karson, much of the balance of the meeting was devoted to the 109 COCOT lines which ATI had recently purchased from CPI. The NYTel representatives informed Mr. Coghlin that these lines had not been transferred to ATI on NYTel's books because outstanding indebtedness on the lines had not been paid. As Ms. Feeney put it: "I gave him [Mr. Coghlin] his options. He would have to pay the amounts in full.... Basically that was it; either pay the bill or they [the 109 lines] would have to be terminated." Faced with the likely physical destruction of its coin-operated telephones, including the 109 lines, in the event of interruption of service, CPI on July 21, 1989 filed its petition under Chapter 11, thereby invoking the automatic stay under section 362(a) prohibiting NYTel from interrupting on any CPI lines. Despite being informed orally and in writing of the bankruptcy filing and the impact of the automatic stay, NYTel nevertheless interrupted service on the 109 lines, as well as other CPI lines. This violation of the automatic stay constituted gross negligence or willful misconduct.

## V. *Compensatory Damages*

The Court finds that CPI sustained economic injury in two separate and independent respects by reason of NYTel's wrongful conduct. First, as a consequence of NYTel's material misrepresentations and violations of the Public Service Commission tariffs at the July 20 meeting, CPI suffered the substantial destruction of its business as a viable economic entity. It was deprived of agreements with ATI and GTE which were designed to place the merged CPI/ATI entity in a strong position as the largest independent competitor in the coin-operated telephone industry.

Second, CPI was injured by NYTel's tortious interference with the conduct of CPI's business during the post-petition period by terminating service on COCOT lines (including the 109 lines which were the subject of lengthy discussion at the July 20 meeting), continued billing of very large volumes of AT & T long-distance charges, billing CPI for charges attributable to NYTel's own coin-operated telephones, failure to discontinue service on certain lines when requested to do so and persistence in rendering separate bills on each of CPI's 1,000–odd accounts despite the testimony of Mr. Fiebert (unrebutted by the tender of any evidence by NYTel) that NYTel employed unified billing statements for other companies with multiple lines. The measure of compensatory damages for NYTel's July 20 and post-petition conduct remains to be considered.

The Trustee presented one expert on the subject of damages, Steven G. Chrust. The Court found Mr. Chrust to be qualified by his experience (which included having been a principal and chairman of a company engaged in the COCOT business during the relevant period) to testify as an expert on damages.

Mr. Chrust testified as to two methods for valuing a company engaged in the COCOT business as an ongoing concern. One was an equity method of valuation, derived simply by multiplying the publicly-traded per share value of the stock times the number of shares outstanding. The second method was to ascertain the going concern value of a COCOT line, as evidenced by actual transactions in the industry, and multiply that figure times the number of operating COCOT lines. Mr. Chrust testified that operating COCOT lines would be valued in the marketplace in a range from $2,000 to $5,000 per line. Mr. Chrust expressed the opinion that $4,500 per line was a fair average valuation of the CPI lines, and he applied this figure to the figure of 1,650 lines which appears in the Undisputed Facts section of the Pretrial Order. The Trustee's total damage claim based on Mr. Chrust's testimony and a variety of adjustments is approximately $15,000,000.

**■** I conclude that the equity method of valuation is inappropriate in this case. Stock

trading values in January, or March, or July 1989 provide little meaningful guidance in this case as to the true "value" of CPI as a going concern, since the marketplace was not and could not be informed of the Company's financial status and future prospects as of the relevant date, July 20, 1989.

I accept Mr. Chrust's per line asset method of valuation but conclude that the figures utilized in Mr. Chrust's calculation require some modification. As to the first element, the per line valuation, the only evidence at trial of actual sales of COCOT lines was that of sales of several batches of lines by CPI to ATI during the months preceding July 1989 at per-line values below $4,500. Recognizing that the transactions with ATI were in the nature of "fire sales" resulting from CPI's financial problems with NYTel and GTE, both of which were to have been resolved by the agreements among the three parties reached in July, nevertheless it appears that some reduction from Mr. Chrust's $4,500 figure is appropriate. Considering all of the evidence, including the expert testimony of Mr. Chrust, I conclude that $4,000 per line is an appropriate measure of average value for the CPI COCOTs.

Turning to the second element, the 1,650 line figure appearing in the Undisputed Facts represented the total number of COCOTs operated by CPI during a several year time frame, not the number of lines in existence on July 20. The damages sustained by CPI as a consequence of NYTel's conduct at the July 20 meeting must include the value of the combined CPI/ATI entity which would have resulted from the merger. See *Italian & French Wine Company of Buffalo v. Negociants U.S.A.*, 842 F.Supp. 693, 701–02 (W.D.N.Y.1993); *Guard–Life Corp. v. Parker Hardware Manufacturing*, 50 N.Y.2d at 197, 428 N.Y.S.2d 628, 406 N.E.2d 445 (in an action for tortious interference the plaintiff is entitled to sue for "the full pecuniary loss of the benefits of the contract with which [defendant] interferred"); *Purgess, M.D. v. Sharrock, M.D.*, 33 F.3d 134, 142 (2d Cir.1994) (anesthesiologist awarded damages amounting to difference in income between his potential earning capacity and the salary of a job he was forced to take as a result of tortious interference committed by the defendant); *Karen Wasserman v. NRG Realty Corporation*, 118 A.D.2d 495, 500 N.Y.S.2d 109 (1986) (landlord violated lease agreement by unreasonably withholding his consent to subletting of plaintiff's apartment; plaintiff was not only entitled to the value of the fixtures which were to be sold as part of the subletting, but also the market value of the fixtures, *i.e.*, the profits that would have accrued from the sale of the apartment). There is some confusion in the evidence as to the number of CPI and ATI COCOT lines extant as of July 20. Utilizing NYTel's own documents and relying on tallies therefrom represented by the Trustee's counsel, defendant's Exhibit DD shows that CPI had 936 lines as of August 22, 1989, (CPI had no fewer lines on the previous July 20), and defendant's Exhibit AAA shows that ATI had purchased 336 lines from CPI. Mr. Coghlin testified that ATI had started with 150 lines. These three figures total 1,422, which the Court finds to be the number of operating COCOT lines of CPI and ATI as of July 20, 1989.

Applying the $4,000 value multiplier to the 1,422 lines results in a total value, rounded off, of $5,700,000. To this figure must be added the value of the $1,600,000 capital infusion to be provided by ATI. Mr. Chrust substantially augmented the cash infusion figure upon the assumption that the cash could be used to acquire new COCOT lines for a fraction of the $4,500 per line value which the newly-acquired lines would have once they became operational. I conclude that such escalation in the value of the cash infusion is unwarranted, not only because approximately $600,000 would have been required to retire CPI's debt to NYTel but also because the escalation in value would depend upon success in finding appropriate locations, negotiating with owners for the right to place the phones, et cetera, *i.e.*, future utilization of the cash infusion and business activities which were neither planned nor specifically contemplated as of the July 20 valuation date. Adding the $1,600,000 cash infusion on a dollar-for-dollar basis to the $5,700,000 figure results in a total damage figure as of July 20, 1989 of $7,300,000.

To this must be added the consequential damages resulting from NYTel's post-petition conduct which frustrated the effort by CPI and ATI to bring about a successful reorganization of CPI. The ATI priority claim constitutes the only appropriate increment in damages post-petition. ATI's $400,000 priority claim is a charge against the assets which would otherwise be distributable to CPI's pre-petition creditors and, accordingly, is an appropriate element of damage in this bankruptcy. The same cannot be said for the damages sustained by ATI itself, whether or not caused by the same post-petition conduct of NYTel complained of in this case.

At the trial NYTel did not present any evidence or expert testimony on the subject of damages. The arguments regarding damages advanced by NYTel in summation and post-trial submissions have been considered elsewhere in this opinion.

Accordingly, the Court concludes that CPI sustained compensable damages totalling $7,700,000, consisting of $7,300,000 as of July 20, 1989 and the $400,000 priority claim of ATI incurred during the post-petition period. The Order and Judgment shall provide for statutory interest on $7,300,000 from the date of commencement of this adversary proceeding.

## VI. *Punitive Damages*

The New York State Court of Appeals has provided a useful analysis of the subject of punitive damages in *Home Insurance Company v. American Home Products Corporation*, 75 N.Y.2d 196, 203–204, 551 N.Y.S.2d 481, 485–86, 550 N.E.2d 930, 934–35 (1990):

... We discern no relevant difference between the rules governing punitive damages in New York and the comparable rules in Illinois. In New York, as in Illinois, punitive damages are intended to act as a deterrent to the offender "and to serve as a warning to others. They are intended as punishment for gross misbehavior for the good of the public and have been referred to as 'a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine.' [Citations omitted.] Punitive damages are allowed on the ground of public policy and not because the plaintiff has suffered any monetary damages for which he is entitled to reimbursement; the award goes to him simply because it is assessed in his particular suit. The damages may be considered expressive of the community attitude towards one who wilfully and wantonly causes hurt or injury to another." (*Reynolds v. Pegler*, 123 F.Supp. 36, 38 (S.D.N.Y. 1954), *aff'd*, 223 F.2d 429 (2d Cir.1955), *cert. denied*, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (quoted in *Toomey v. Farley*, 2 N.Y.2d 71, 83, 156 N.Y.S.2d 840, 138 N.E.2d 221 [ (1956) ].) The nature of the conduct which justifies an award of punitive damages has been variously described, but, essentially, it is conduct having a high degree of moral culpability (*see, Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 [ (1961) ] ) which manifests a "conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." (*Welch v. Mr. Christmas*, 57 N.Y.2d 143, 150, 454 N.Y.S.2d 971, 440 N.E.2d 1317 [ (1982) ].) Such conduct need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness (*see, Giblin v. Murphy*, 73 N.Y.2d 769, 772, 536 N.Y.S.2d 54, 532 N.E.2d 1282 [ (1988) ]; *Public Serv. Mut. Ins. Co. v. Goldfarb, supra*, 53 N.Y.2d [392] at 400, 442 N.Y.S.2d 422, 425 N.E.2d 810 [ (1981) ]; N.Y. PJI 2:278).

... The concept of punitive damages has been sanctioned under New York law in actions based on negligence (*see, Wittman v. Gilson*, 70 N.Y.2d 970, 972, 525 N.Y.S.2d 795, 520 N.E.2d 514 [ (1988) ]; *Caldwell v. New Jersey Steamboat Co.*, 47 N.Y. 282, 296 [ (1872) ] ) and strict products liability (*see, Bikowicz v. Nedco Pharmacy*, 130 A.D.2d 89, 94, 517 N.Y.S.2d 829 [ (1987) ]; *see also, Racich v. Celotex Corp.*, 887 F.2d 393 (2d Cir.1989); *Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 838–842 (2d Cir.1967)).

Thus, the inquiry in a claim for punitive damages is whether the defendant's conduct

- may be described as "having a high degree of moral culpability", or

- manifests a "conscious disregard of the rights of others or [is] so reckless as to amount to such disregard", or

- consists of actions which, although not "intentionally harmful ... constitute willful or wanton negligence or recklessness".

■ For reasons set forth at length in prior sections of this decision, this Court's findings that NYTel's misrepresentations, unlawful threats of termination and post-petition conduct including violation of the automatic stay constituted "gross negligence or willful misconduct" amply support an award of punitive damages under the standards articulated by the New York courts, quoted above.

But there is an additional element supporting a punitive damage award in this case. The Trustee has argued that NYTel's conduct complained of in this action was intentional and was motivated by a competitive intent to drive from the marketplace what promised to be NYTel's largest and strongest independent COCOT vendor in the metropolitan New York area embodied in the prospective merger of ATI and CPI, supported by GTE. Surprisingly, NYTel fortifies this argument by asserting in its Post-Trial Memorandum (pp. 24–25) and Post-Trial Reply Memorandum (pp. 28–29) that its conduct in interfering with CPI's economic opportunities must be judged under the more stringent standard of one whose actions are "intended, at least in part, to advance its own competing interests", citing and quoting from *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d at 269. NYTel's evident concession, indeed assertion, that its actions which are at issue in this proceeding were "intended, at least in part, to advance its own competing interests" underscores the appropriateness of punitive damages in this case. It is simply not open to a public utility, invested by the State with monopoly power, to use tactics of misrepresentation and unlawful threats to advance its own interests as a competitor at the expense of its own captive customer.

NYTel opposes punitive damages on three grounds. First, it asserts that punitive damages may not be awarded absent a showing of cognizable compensatory damages. The Court has held that CPI sustained cognizable compensatory damages. Second, it asserts that its conduct did not meet the standards required for punitive damages under New York law. The Court has found that NYTel's conduct manifested a "conscious disregard of the rights of others [and was] so reckless as to amount to such disregard" and "constitute[d] willful or wanton negligence or recklessness". Third, NYTel asserts that New York requires "a high level of general managerial authority in relation to the nature and operation of the employer's business", citing *Moretto v. G & W Electric Company*, 20 F.3d 1214, 1223 (2d Cir.1994), *quoting Loughry v. Lincoln First Bank, N.A.*, 67 N.Y.2d 369, 380, 502 N.Y.S.2d 965, 971, 494 N.E.2d 70, 76 (1986). Both Ms. Quattrone and Ms. Feeney, by their own testimony, occupied the highest level of general managerial authority in respect of the relevant business relationship between CPI and NYTel. Indeed, Ms. Feeney was the director of the billing department with responsibility for determining and collecting the amount which CPI owed NYTel.

■ There remains to be determined only the amount of punitive damages to be awarded. I reject as excessive the Trustee's request for punitive damages in an amount equal to the compensatory damages. Although Congress has provided for treble damages in a number of contexts, such as the antitrust laws and the Racketeer Influenced and Corrupt Organizations Act (RICO), I believe that the objectives of a punitive damage award will be served by limiting the punitive damages to $1,000,000, equating to 13% of the compensatory damages awarded by the Court.

Counsel for the Trustee will settle an order consistent with this decision.